TRUCK INSURANCE EXCHANGE,
Appellant,

v.

PRAIRIE FRAMING, LLC, Robert T.
Winger, Katherine Rolfe, Eric Rolfe
and Paul Rolfe, Respondents.

No. WD 61786.

Missouri Court of Appeals,
Western District.

Feb. 15, 2005.

Motion for Rehearing and/or Transfer to
Supreme Court Denied March 29, 2005.

Application for Transfer Denied
May 31, 2005.

Douglas R. Richmond, Patrick J. Kenny and Carlton D. Callenbach, Kansas City, MO, for Appellant.

Brian J. Madden and Todd M. McGuire, Kansas City, MO, for respondents Rolfe.

Douglas M. Weems and Virginia Stevens Crimmins, Kansas City, MO, for Respondent Prairie Framing, LLC.

Before HOWARD, P.J., and LOWENSTEIN and SMART, JJ.

PER CURIAM:

Eugene Rolfe died in his vehicle when it caught fire after being struck from behind by a truck driven by Robert Winger. Mr. Rolfe's family brought a wrongful death action against Winger, his employer Prairie Framing, LLC, and various other defendants. Truck Insurance Exchange (TIE) petitioned for a declaratory judgment that it owed no duty to defend and indemnify Prairie Framing or its employees under its commercial general liability (CGL) policy with Prairie Framing. Prairie Framing, Winger, and the Rolfes (Defendants) counter-claimed for declaratory judgment, alleging that TIE acted in bad faith in refusing to settle with the Rolfes for the policy limits.

After TIE refused to unequivocally defend Prairie Framing, Prairie Framing assumed full control of its own defense. Prairie Framing then entered into a section 537.065 [1] Agreement with the Rolfes, consented to the Rolfes' filing of a Second Amended Petition, and stipulated to its liability for negligent supervision. While the declaratory judgment action remained pending, the Rolfes tried the issue of damages in their wrongful death action against Winger and Prairie Framing to the court. The trial court entered a $5,775,000 judgment for the Rolfes, which, after settlement credits, amounted to a $4 million judgment against Prairie Framing.

The parties then filed cross-motions for summary judgment in the declaratory judgment action, and the trial court entered summary judgment for Defendants.

The court held, as a matter of law, that TIE violated its duty to defend and indemnify Prairie Framing and that TIE acted in bad faith in not settling the Rolfes' claims against Prairie Framing. Thus, the court ordered TIE to pay the entire $4 million judgment against Prairie Framing, in addition to Prairie Framing's attorney's fees and expenses for defense of the underlying claim.

TIE alleges six points of error in its appeal from the summary judgment. Its first three points address the trial court's holding that it had a duty to defend and indemnify Prairie Framing. Point IV addresses the trial court's holding that TIE violated its duty to settle in good faith. Point V attacks the reasonableness of the $4 million judgment against Prairie Framing. And, finally, Point VI involves the effect on post-judgment interest should this court reverse on any of the previous points. After our consideration of each of TIE's claims on appeal, we affirm the trial court's summary judgment in part and reverse in part.

## BACKGROUND

Because the parties' arguments relate in large part to procedural timing, the extensive factual and procedural details leading to this appeal are chronologically depicted below.

### FEBRUARY 17, 1999—THE COLLISION:

On February 17, 1999, Winger, a foreman employed by Prairie Framing, and his crew were performing framing work on a new home when it began snowing. Unable to work in the snow, Winger and his crew went to Michael's Lakewood Pub, LLC, (the Pub) at about 11:30 a.m. for some beers. Winger's supervisor, Carl Daven-

---

1. Statutory references are to the Revised Statutes of Missouri (2000).

port, and his crew joined them shortly thereafter. The group took turns buying rounds of pitchers of beer for each other all afternoon. Michael Hiesberger, an owner/member of Prairie Framing, arrived at the Pub sometime between 4:30 and 5:00 p.m. Winger left the Pub around 5:30 p.m. Davenport and Hiesberger stayed there. When Hiesberger asked Winger "if he was okay," Winger replied that there was no reason to worry because he was driving his wife's Ford F150 truck, not the company van.

After leaving the Pub, Winger rear-ended a 1998 Jeep Cherokee driven by Eugene Rolfe, which had stopped at a stoplight. As a result of the collision, the Cherokee burst into flames. Mr. Rolfe was unable to escape and died in the fire. When the collision occurred, Winger was transporting tools for Prairie Framing, which was part of his responsibilities as foreman. Winger's blood alcohol content was .204%.

### AUGUST 19, 1999—THE ROLFES' WRONGFUL DEATH PETITION:

Eugene Rolfe's wife and sons—Katherine, Eric, and Paul (the Rolfes)—filed a wrongful death action in the Circuit Court of Jackson County, Missouri. They named Daimler–Chrysler,[2] Robert Winger, and Prairie Framing, LLC, as defendants. They alleged Winger was liable under negligence and negligence per se theories. They also alleged Prairie Framing was liable under theories of (1) respondeat superior; (2) negligent retention; and (3) negligent supervision.

### APRIL 1, 2000—TIE'S RESERVATION OF RIGHTS LETTER:

At the time of the accident, Prairie Framing had a $1 million CGL insurance policy with TIE. TIE initially assigned attorney Lance LeFevre to defend Prairie

Framing in the Rolfes' litigation. Seven months later, TIE notified Prairie Framing by letter that "[a]dditional facts and information have been developed which necessitates this notice, that certain issues contained in the litigation are now subject to defense under a full Reservation of Rights." After outlining the policy coverage and the "liquor liability" and "auto" exclusion sections in the policy, TIE's letter informed Prairie Framing:

> Indications of fact as well as allegations being presented reflect events that may fall outside the scope of the Businessowners Liability Coverage Form issued to Prairie Farming [sic] LLC; specifically whether Robert Winger was within the scope and course of his employment at the time of the occurrence involved; whether the operation of a motor vehicle involved in the loss falls under the [policy's "auto"] exclusion cited [therein].

The letter further advised Prairie Framing of its right to "retain personal counsel to associate with the assigned defense firm."

### APRIL 3, 2000—COUNSEL ADVISES TIE OF THE LIKELIHOOD OF JUDGMENT IN EXCESS OF POLICY LIMITS:

Lance W. LeFevre wrote an extended letter to TIE summarizing the deposition testimony given by Hiesberger, Davenport, and other Prairie Framing employees. Mr. LeFevre ultimately advised TIE:

> The bottom line is that, in my opinion, it is extremely unlikely that Judge Dean could be persuaded to grant summary judgment to Prairie Framing on this evidence and I think that it is more likely than not that the case against Prairie Framing would ultimately be found to be at least submissible to the jury. If it is determined to be a jury

---

2. Daimler–Chrysler settled with the Rolfes prior to trial and is not a part of this appeal.

issue ... I doubt that Prairie Framing would get much sympathy from a jury in view of the direct involvement of management personnel in the facts. From an exposure perspective, this is a very dangerous case. Liability is aggravated both from the facts involving the intoxicated driver and from the manner in which the decedent died. I would suggest to you that no one in this locale would be surprised by a verdict in an amount multiple of the $1,000,000 limit of your policy.

## AUGUST 16, 2000—THE ROLFES' FIRST AMENDED PETITION:

In May of 2000, after invalidation of a portion of Missouri's Dram Shop Act,[3] the Rolfes moved to add Michael's Lakewood Pub, LLC, as a defendant. With no opposition, the trial court granted their motion, and on August 16, 2000, the Rolfes filed their First Amended Petition. Except for the addition of the pub as a defendant and the separate claims brought against the pub, the petition remained substantially the same as their original petition.

## AUGUST 29, 2000—PRAIRIE FRAMING DEMANDS TIE SETTLE FOR THE POLICY LIMITS:

Joseph Lewis, who had taken over Prairie Framing's defense from Mr. LeFevre, wrote TIE. Lewis enclosed the answer to the Rolfes' First Amended Petition he had prepared and filed on Prairie Framing's behalf that same day. As with the answer to the original petition, this answer denied the allegation that Winger was acting within the scope of his employment at the time of the accident. Mr. Lewis further advised TIE, "Mike Heisberger [sic] ... has requested that I inform you ... that Prairie Framing demands that this case be settled within the limits of the insurance policy issued to Prairie Framing."

## NOVEMBER 22, 2000—TIE'S DECLARATORY JUDGMENT PETITION:

On November 22, 2000, TIE filed a petition for declaratory judgment, asking the court to declare that TIE "owes no duty to defend or indemnify defendants Prairie or Winger, or any other insured under the policy of insurance at issue, for the claims in the [Rolfes'] Lawsuit." TIE claimed that its policy with Prairie "does not cover and contains exclusions from coverage for the [Rolfes'] claims made in the Lawsuit." In support of its claims of non-coverage, TIE referenced its April 1, 2000 reservation of rights letter and quoted from coverage and exclusion provisions of its policy with Prairie Framing. TIE then alleged that the Rolfes' claims made in their lawsuit against Winger and Prairie Framing:

[did] not fall within the aforementioned coverage and/or are excluded by the aforementioned policy language in that:

a. With respect to Robert T. Winger, Winger is not an insured under the policy as he was not within the scope of his employment by Prairie and he was not performing duties related to the conduct of Prairie's business.

b. None of the damages which are claimed to have resulted from the actions of Prairie or Winger were caused by an occurrence.

c. The automobile exclusion found in the Policy, § B.1.g (see above), is applicable and, thus, there is no coverage under the terms of the policy.

## JUNE 19, 2001—PRAIRIE FRAMING DEMANDS TIE ADMIT COVERAGE:

Douglas Weems, Prairie Framing's independently hired counsel, wrote TIE's counsel "request[ing] that [TIE] admit that insurance coverage exists for the collision between Robert T. Winger and Eugene

---

**3.** *See Kilmer v. Mun,* 17 S.W.3d 545, 550–54 (Mo. banc 2000).

Rolfe." The letter further informed TIE that its April 1, 2000 reservation of rights letter "[was] not acceptable." It then stated:

[I]f [TIE] does not admit the existence of coverage, *then [TIE] will not be permitted to participate in the defense of this lawsuit of Prairie Framing, LLC's, behalf.*

If you do not admit coverage within 10 days, then Prairie Framing, LLC, will proceed to defend its own interests in this matter. Prairie Framing, LLC is interested in settling this case in an attempt to buy its peace.

## JUNE 21, 2001—THE ROLFES' § 408.040 DEMAND LETTER TO TIE FOR POLICY LIMITS SETTLEMENT:

The Rolfes' counsel wrote Mr. Weems and Mr. Lewis demanding $1 million from Prairie Framing and/or TIE to settle any and all claims in their wrongful death lawsuit.

## JULY 11, 2001—PRAIRIE FRAMING TERMINATES COUNSEL HIRED BY TIE:

Mr. Weems notified Joseph Lewis that his "representation of [Prairie Framing's] interests in the *Rolfe* case must be terminated." The letter further stated:

Prairie Framing, L.L.C. is not expressing any dissatisfaction of your representation of its interests. The dispute as you know is solely with its insurance carrier. [TIE]'s unwillingness to admit coverage for this collision has forced this unfortunate turn of events. Unfortunately because of this dispute, Prairie Framing, L.L.C. must terminate your representation.

## JULY 24, 2001—PRAIRIE FRAMING AGAIN DEMANDS SETTLEMENT BY TIE:

Prairie Framing sent another letter to TIE demanding that TIE settle within the policy limits. The letter further informed TIE, "should the case go to trial and a judgment is returned over and above the policy limits, Prairie Framing Company, L.L.C. will seek to recoup such costs from [TIE] based on the tort of bad faith refusal to settle a claim."

## JULY 31, 2001—THE ROLFES' MOTION FOR LEAVE TO FILE SECOND AMENDED PETITION AND FIRST AMENDED ANSWER TO TIE'S PETITION FOR DECLARATORY JUDGMENT:

The Rolfes moved for leave to file a second amended petition. In their motion, the Rolfes stated that they:

wish[ed] to drop their claim of *respondeat superior* against Prairie Framing LLC because the evidence [did] not support [their] *respondeat superior* claim. [The Rolfes] have settled with defendants Daimler–Chrysler Corporation and Michael's Lakewood Pub LLC, leaving Robert Winger and his employer Prairie Framing as the only remaining defendants in the case.

The motion further stated, "Counsel for Robert Winger and Prairie Framing LLC have no objection to plaintiffs being allowed to file their Second Amended Petition which removes the *respondeat superior* claim against Prairie Framing LLC."

That same day, the Rolfes filed an unopposed motion for leave to file a First Amended Answer to TIE's declaratory judgment petition. The court eventually granted the motion and deemed the amended answer filed on July 19, 2002, the date of the trial court's summary judgment now at issue on appeal.

## AUGUST 2, 2001—PRAIRIE FRAMING AND THE ROLFES ENTER INTO A § 537.065 AGREEMENT:

The Rolfes and Prairie Framing entered into an agreement pursuant to section

537.065,[4] in which the Rolfes agreed to execute only against insurance proceeds in the event of a judgment against Prairie Framing, which the trial court later approved. In return, Prairie Framing agreed:

(a) To speak truthfully when giving testimony concerning the facts and circumstances surrounding its actions or omissions in connection with Robert Winger on or before February 17, 1999;

(b) To refuse to permit any insurance company to defend the lawsuit filed by [the Rolfes] unless the company first admits that the applicable insurance policy provides coverage for any liability on the part of defendant Prairie Framing LLC for the death of Eugene Rolfe;

(c) To allow [the Rolfes] to take a default judgment (if [the Rolfes] desire to do so) against defendant Prairie Framing LLC if no insurance company defends the lawsuit in conformity with the terms outlined in Section (b) above; and

(d) To enter into [a Stipulation of liability.]

## AUGUST 3, 2001—TIE's CONDITIONAL OFFER OF DEFENSE TO PRAIRIE FRAMING:

Casey Griffith, counsel for TIE, wrote to Mr. Weems, stating as follows:

I am writing this letter to confirm my client's offer to Prairie Framing, which you and I have agreed will remain confidential, except it is expected that you will communicate with your client regarding this offer. The offer is conditional upon the following: (1) Prairie Framing will cease from entering into a [section] 537.065 agreement with the Rolfes or otherwise settling the Rolfes['] claims; and (2) the Rolfes' proposed Second Amended Petition for Damages in the underlying action must be approved by the court and must be filed. If both (1) and (2) above take place, then Truck Insurance Exchange will withdraw its reservation of rights letter, admit that the allegations in the proposed Second Amended Petition for Damages are covered and defend Prairie Framing against said allegations, and will agree to pay your attorneys' fees in representing Prairie Framing.

## AUGUST 7, 2001—TIE'S WITHDRAWAL OF RESERVATION OF RIGHTS UPON FILING OF THE ROLFES' SECOND AMENDED PETITION

TIE's counsel sent by facsimile and through the mail another letter to Mr. Weems, this time stating TIE would withdraw its reservation of rights if the second amended petition were filed.

## AUGUST 8, 2001—THE ROLFES FILE THEIR SECOND AMENDED PETITION:

The trial court granted the Rolfes' motion, and they filed their Second Amended

---

4. Section 537.065 RSMo 2000 provides in relevant part:

Any person having an unliquidated claim for damages against a tort-feasor, on account of bodily injuries or death, may enter into a contract with such tort-feasor or any insurer in his behalf or both, whereby, in consideration of the payment of a specified amount, the person asserting the claim agrees that in the event of a judgment against the tort-feasor, neither he nor any person, firm or corporation claiming by or through him will levy execution, by garnishment or as otherwise provided by law, except against the specific assets listed in the contract and except against any insurer which insures the legal liability of the tort-feasor for such damage and which insurer is not excepted from execution, garnishment or other legal procedure by such contract.

Petition on August 8, 2001. This petition lacked the previous allegations that Winger was in the course and scope of his employment at the time of the collision and corresponding respondeat superior claim. It retained the negligent supervision and retention claims. As emphasized, these claims varied slightly from those in the original and first amended petitions in that the Second Amended Petition alleged:

53. On February 17, 1999, supervisors and members of Prairie Framing knew or had reason to know that they had the right to control Defendant Winger in the transportation of Prairie Framing tools and use of Prairie Framing timesheets.

54. On February 17, 1999, Robert *Winger was transporting and/or using Prairie Framing tools and timesheets at the time of the collision.*

55. Defendant Prairie Framing had a duty to Eugene Rolfe to prevent Defendant Winger from operating his motor vehicle when Defendant Prairie Framing knew or should have known that Defendant Winger was intoxicated.

56. Defendant Prairie Framing, acting through its officers, agents, members or employees, was negligent for the following reasons:

a. Defendant Prairie Framing retained Defendant Winger in its employment when it knew or should have known Defendant Winger's drinking and driving posed a danger; and/or

b. Prairie Framing was negligent in its supervision of Defendant Winger in that it allowed Defendant Winger *to transport its tools and use its time sheets* when it knew or should have known Defendant Winger was too intoxicated and knew or should have known of *the necessity and opportunity for preventing Defen-*

*dant Winger from transporting Prairie Framing tools in an intoxicated state.*

**AUGUST 20, 2001—TIE'S LETTER TO PRAIRIE FRAMING REGARDING DEFENSE ON SECOND AMENDED PETITION:**

The Rolfes' wrongful death action and TIE's declaratory judgment action were consolidated in Division 15 of the Circuit Court of Jackson County.

TIE's counsel again wrote to Prairie Framing's counsel, this time stating that it would withdraw its reservation of rights but that it believed any section 537.065 Agreement entered into would be inapplicable.

**SEPTEMBER 5, 2001—PRAIRIE FRAMING RESPONDS TO TIE'S LETTERS ABOUT DEFENDING PRAIRIE FRAMING:**

Mr. Weems wrote TIE's counsel in response to his August 7, 20, and 28 letters. Weems noted that "[o]nly after Prairie Framing reached an agreement with the Rolfes did TIE suggest that it might defend without a reservation of rights," but Prairie Framing would accept TIE's defense if TIE would not attack the 537.065 Agreement and defend only on the damages issue. First, Mr. Weems outlined the "ample opportunity" TIE had to settle within the policy limits while defending Prairie Framing, concluding TIE's "wrongful failure to settle was potentially in bad faith and violates the terms of the insurance contract." Second, Mr. Weems highlighted the opportunities he gave TIE to defend Prairie Framing without a reservation of rights; TIE's failure to respond to its June 19, 2001 demand for removal of its reservation of rights, and Prairie Framing's corresponding termination of TIE's defense of Prairie Framing. It was after this that Prairie Framing entered into the

section 537.065 Agreement with the Rolfes. Mr. Weems then informed TIE's counsel:

Although your August 20 letter suggests that you are unclear about the status of Prairie Framing's agreement with the Rolfes, Prairie Framing informed TIE that the settlement agreement between the Rolfes and Prairie Framing was enforceable on August 2. By letter dated August 3, 2001, TIE suggested that it would defend Prairie Framing without a reservation of rights if the Court permitted the Rolfes to file their second amended petition, which simply dropped the respondeat superior claim. In a follow up phone call, TIE indicated that it wanted Prairie Framing to withdraw from the 537.065 agreement. Prairie Framing again informed TIE that withdrawing from the agreement was not possible and was not in Prairie Framing's best interests. If Prairie Framing attempted to withdraw from the agreement, the Court would in all likelihood allow the Rolfes to re-amend their petition.

## SEPTEMBER 25, 2001—TIE'S MOTION FOR SUMMARY JUDGMENT:

TIE moved for summary judgment on its declaratory judgment petition. In the "MATERIAL FACTS" section of its motion, TIE first pointed out that the Rolfes' First Amended Petition alleged, as a fact applicable to all counts therein, that Winger was in the course and scope of his employment at the time of the collision. TIE then detailed what had subsequently happened with the case, specifically citing the various letters between counsel, most of which we have detailed above. At the conclusion of the motion, TIE prayed that the court enter a declaratory judgment finding that:

(1) [TIE] cannot be liable for any judgment against Prairie Framing because

Prairie Framing has refused [TIE]'s offer to defend the Amended Petition without reservation; (2)[TIE] was not under a duty to defend Prairie Framing against the allegations contained in the Petition because the allegations contained in the Petition do not fall within the coverage of the Policy and are excluded from coverage under the policy, and because the Petition failed to state a claim of negligence against Defendant Prairie Framing; (3) Prairie Framing was not permitted to settle with the Rolfes because [TIE] was under no duty to defend or indemnify the Petition and [TIE] cannot be liable for any judgment against [P]rairie [F]raming; (4)[TIE] cannot be liable for any judgment against Prairie Framing because the settlement between Prairie Framing and the Rolfes is collusive and unreasonable; and (5)[TIE]'s liability cannot exceed the policy limits of insurance because, as a matter of law, [TIE] did not refuse to settle the Rolfes' claims in bad faith....

On this same date, TIE moved to file its First Amended Petition for Declaratory Judgment. Defendants did not oppose. The trial court deemed the amended petition filed on July 19, 2002.

## SEPTEMBER 27, 2001—PRAIRIE FRAMING'S LETTER TO TIE CONFIRMING TIE'S DUTY TO DEFEND AND INDEMNIFY:

Counsel for Prairie Framing wrote TIE: "You have indicated that [TIE] is prepared to immediately and without reservation assume the defense and indemnification of Prairie Framing, LLC against the allegations contained in plaintiff's Second Amended Petition. Prairie Framing, LLC accepts TIE's unqualified offer of defense and indemnification in this matter." The letter further notified TIE of the October 1, 2001, 9:00 a.m. trial setting in the Rolfes' wrongful death action. Counsel then re-

stated Prairie Framing's understanding that "[c]onsistent with its agreement to defend and indemnify, ... TIE will promptly dismiss its declaratory relief action." As explained below, in a letter dated the following day, TIE declined to defend Prairie Framing.

**SEPTEMBER 28, 2001—(a) ROLFES OFFER TO SETTLE FOR POLICY LIMITS; (b) TIE DENIES UNCONDITIONAL DEFENSE; (c) PRAIRIE FRAMING'S RESPONSE; (d) PRAIRIE FRAMING FILES STIPULATION OF LIABILITY:**

(a) The Rolfes sent a letter to TIE's counsel, Casey Griffith, reiterating its $1 million settlement demand.

(b) Casey Griffith also wrote to Mr. Weems and another attorney at his firm indicating that TIE had "decided to turn down [Prairie Framing's] request [for TIE's defense]." Mr. Griffith declared that the section 537.065 Agreement and Prairie Framing's stipulation to liability, "greatly undermines [TIE's] ability to defend Prairie Framing and, in fact, would constitute yet another breach of the cooperation clause of the insurance policy."

(c) In a letter faxed to Mr. Griffith that same day, Prairie Framing responded that it could not, as TIE had requested, "unilaterally 'withdraw' " from the section 537.065 Agreement because it was a binding contract. Prairie Framing further acknowledged TIE's decision to decline coverage and noted it would "proceed accordingly."

(d) Also on that same day, the following Stipulation, signed by the Rolfes' counsel and Mr. Weems, was filed with the court:

1. Robert Winger, a Prairie Framing employee, consumed excessive amounts of alcohol with agents, officers, members or employees of defendant Prairie Framing on February 17, 1999 at Michael's Lakewood Pub LLC in Lee's Summit, Missouri.

2. Members and supervisors of Prairie Framing knew Defendant Winger was intoxicated before he left Michael's Lakewood Pub.

3. Michael Heisberger [sic], a member of Prairie Framing LLC, took charge of Defendant Winger at Michael's Lakewood Pub by offering Winger a ride, but then allowed Winger to drive while intoxicated.

4. At or immediately prior to the time of collision, Defendant Winger was transporting Prairie Framing tools and/or using Prairie Framing timesheets.

5. Agents, officers, members or employees of Defendant Prairie Framing did not prevent Defendant Winger from transporting Prairie Framing tools and using Prairie Framing timesheets after consuming excessive amounts [of] alcohol and while intoxicated on February 17, 1999.

6. On February 17, 1999, supervisors and members of Prairie Framing knew or had reason to know that they had the right to control Defendant Winger in his transportation of Prairie Framing tools and use of Prairie Framing timesheets.

7. Defendant Prairie Framing had a duty to Eugene Rolfe to prevent Defendant Winger from operating his motor vehicle when Defendant Prairie Framing knew or should have known that Defendant Winger was intoxicated and was transporting Prairie Framing tools and using Prairie Framing timesheets.

8. Prairie Framing was negligent in its supervision of Defendant Winger in that it allowed Defendant Winger to transport its tools and use its timesheets when it knew or should have known Defendant Winger was too intoxicated and knew or should have known of the

necessity and opportunity for preventing Winger from transporting Prairie Framing tools in an intoxicated state.

9. As a direct and proximate result of the foregoing negligence of Defendant Prairie Framing, Eugene Rolfe was burned and killed and plaintiffs were injured and damaged.

## OCTOBER 1, 2001—TRIAL ON THE ROLFES' SECOND AMENDED PETITION:

The parties waived their right to a jury trial and tried the damages issue to the court. Attorneys Alan Clever and R. Scott Smith represented Prairie Framing.[5] Attorney Jeff Baker represented Winger. The Rolfes noted for the record that prior to trial, they had settled with Daimler-Chrysler for $850,000, and Michael's Lakewood Pub for $800,000, and the court had previously approved those settlements. The Rolfes then put on evidence of their damages. The court admitted Prairie Framing's stipulation of liability, and Prairie Framing did not present any evidence. The Rolfes requested that the court award a total of $11,500,000 in damages. Winger suggested "a more appropriate figure would be below the—$5 million maybe, but I think the $11.5 million . . . is largely based on speculation on their part." Prairie Framing acknowledged the loss to Mr. Rolfe's family and argued that the expert evidence provided a "baseline" of $1,801,732 for actual damages. "[A]s to pain and suffering," Prairie Framing argued only that "[the court] need[ed] to determine that." It did not suggest a dollar amount.

## OCTOBER 9, 2001—TRIAL COURT'S JUDGMENT FOR THE ROLFES:

The trial court entered a judgment for the Rolfes and against all defendants for $5,775,000. Costs were also assessed against the defendants. The judgment further indicated:

> Once the various credits and advance payments are considered and defendants pay the rest of their obligation, plaintiffs' counsel will be allowed to receive a fee of 30%, plus expenses. The remainder will be divided equally between Ms. Rolfe, individually, Ms. Rolfe as Next Friend of Paul Rolfe, and Eric Rolfe.

After credits and advanced payments were deducted, Prairie Framing's liability under the judgment was $4 million.

## OCTOBER 29, 2001—(a) DEFENDANTS' JOINT SUGGESTIONS IN OPPOSITION TO TIE'S SUMMARY JUDGMENT MOTION; (b) DEFENDANTS' CROSS–MOTION FOR SUMMARY JUDGMENT:

(a) After responding to TIE's factual allegations in their September 25, 2001 amended summary judgment motion, Defendants claimed the court had to deny TIE's summary judgment motion because:

(1) TIE had a contractual duty to defend Prairie Framing in the underlying tort action from the onset of the litigation;

(2) TIE has a contractual duty to indemnify Prairie Framing for its liability on the negligent supervision claim;

(3) TIE's duty to indemnify should extend to the $4 Million judgment against Prairie Framing because TIE refused,

---

5. Mr. Smith appeared as counsel for State Farm Insurance, which had a $50,000 auto policy with Prairie Framing. The Rolfes' counsel announced to the trial court that they settled with and agreed to release State Farm for its advance payment of $50,000. Mr.

Smith acknowledged that settlement and indicated to the court, "because there is a minor involved, we felt that it would be necessary for the Court to approve that agreement." The court approved the settlement.

in bad faith, to settle this case within policy limits;

(4) TIE also has a contractual duty to pay post-judgment interest based on the total judgment award against Prairie Framing; and

(5) The 537.065 agreement between the Rolfes and Prairie Framing does not release TIE from its duties to defend and indemnify.

**(b)** In their cross-motion for summary judgment, Defendants sought a judgment finding that TIE had a duty to defend and indemnify Prairie for the reasons enumerated above. Defendants claimed that TIE wrongfully refused to defend and indemnify Prairie Framing on the negligent supervision claim, which was in the Rolfes' original wrongful death petition. They also claimed that TIE's refusal to settle the underlying claim against Prairie Framing within policy limits was in bad faith.

**DECEMBER 3, 2001—TIE'S RESPONSE TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT:**

TIE responded to Defendants' motion by claiming several of their facts cited in support of summary judgment were controverted. TIE stated that it never admitted coverage of the claims in the Rolfes' Second Amended Petition, repeatedly claiming, "[t]he offer to admit coverage in the August 3 letter was rejected by Prairie Framing and thereby extinguished. Also, the other letters contain no admission of coverage by [TIE]. . . . [TIE] did, however, condition its defense of Prairie Framing on Plaintiff's ability to contest liability and damages." TIE admitted to receiving Prairie Framing's July 24, 2001 demand to settle for the policy limits but claimed it "was not allowed the full time to consider that offer to settle[, which was to remain open until at least August 20,] before

[Prairie Framing] entered into the section 537.065 agreement."

**DECEMBER 11, 2001—DEFENDANTS' JOINT ANSWER TO TIE'S FIRST AMENDED PETITION FOR DECLARATORY JUDGMENT AND COUNTERCLAIM:**

After answering TIE's first amended petition, Defendants counterclaimed, requesting a declaratory judgment that "[TIE] refused, in bad faith, to settle [the Rolfes' lawsuit] within its $1 million policy limits, and is therefore liable for the entire underlying $4 million judgment entered against its insured, Prairie Framing, LLC, along with statutory interest on the entire underlying judgment."

**JULY 19, 2002—SUMMARY JUDGMENT ENTERED IN FAVOR OF DEFENDANTS:**

The trial court found there was no genuine dispute of material fact and entered summary judgment for Defendants on TIE's petition and on Defendants' counterclaim. The court held that the uncontroverted facts demonstrated, as a matter of law, that TIE had a duty to defend and indemnify Prairie Framing against the Rolfes' wrongful death petition, which set forth from the outset a negligent supervision claim against Prairie Framing. The trial court further held, as a matter of law, that TIE acted in bad faith in refusing to settle the case within policy limits. So, TIE was obligated to indemnify Prairie Framing for the $4 million judgment "plus 9% interest per annum" and pay Prairie Framing's "legal fees and expenses in the defense of the underlying lawsuit."

This appeal follows.

### STANDARD OF REVIEW

 The parties filed competing summary judgment motions on TIE's declaratory judgment action, and Defendants

moved for summary judgment on their counterclaim for bad faith refusal to settle. "The propriety of summary judgment is purely an issue of law," so we will conduct an "essentially de novo" review of the trial court's summary judgment. *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). We review the record in a light most favorable to the TIE, according it "the benefit of all reasonable inferences from the record." *Id.* Nevertheless, if TIE does not contradict the facts relied upon by Defendants in support of their motion, we regard those facts as true. *Id.*

## POINT I—DUTY TO DEFEND

TIE claims in its first point on appeal that the circuit court erred in holding TIE liable for the alleged breach of its duty to defend for two reasons. First, TIE claims it had no duty to defend Prairie Framing because the policy excluded coverage of the Rolfes' claims against Prairie Framing in their original and First Amended petitions, which claims were premised on Mr. Winger having acted within the course and scope of his work for Prairie Framing. Second, TIE claims it had no duty to defend on the Second Amended Petition because Prairie Framing breached its duties under the policy to immediately forward to TIE all suit papers and to cooperate with TIE in the defense of the suit.

■■ We begin our analysis with the controlling principles regarding an insurer's contractual duty to defend under Missouri law.

An insurance company has a duty to defend an insured when the insured is exposed to *potential* liability to pay based on the facts known at the outset of the case, no matter how unlikely it is that the insured will be found liable and whether or not the insured is ultimately found liable. *McCormack Baron Mgmt.*

*Servs., Inc. v. Am. [Guar.] & Liab. Ins. Co.*, 989 S.W.2d 168, 170 (Mo. banc 1999). To extricate itself from a duty to defend the insured, the insurance company must prove that there is **no possibility** of coverage. *Id.* Coverage is principally determined by comparing the language of the insurance policy with the allegations in the pleadings. *Id.* "However, even though the pleadings do not show coverage, where known or reasonably ascertainable facts become available that show coverage[,] the duty to defend devolves upon the insurer." JOHN ALAN APPLEMAN, 7C INSURANCE LAW AND PRACTICE § 4684.01 (Walter F. Berdal, ed.1979). *Accord Zipkin v. Freeman*, 436 S.W.2d 753, 754 (Mo. banc 1968).

*King v. Cont'l W. Ins. Co.*, 123 S.W.3d 259, 264 (Mo.App. W.D.2003) (emphasis added).

■■ TIE's duty to defend is broader than its duty to indemnify. *McCormack*, 989 S.W.2d at 170. If the allegations and claims in the Rolfes' original and First Amended petitions, and the facts TIE knew or could have ascertained from a reasonable investigation, are *potentially* within the scope of the policy's coverage, then TIE wrongfully refused to defend Prairie Framing. *Valentine–Radford, Inc. v. Am. Motorists Ins. Co.*, 990 S.W.2d 47, 51 (Mo.App. W.D.1999). This duty to defend potentially insured claims arises "even though claims beyond coverage may also be present." *Superior Equip. Co. v. Md. Cas. Co.*, 986 S.W.2d 477, 482 (Mo. App. E.D.1998). As explained in *McCormack*, " '[t]o suggest that the insured must prove the insurer's obligation to pay before the insurer is required to provide a defense would make [the duty to defend] provision a hollow promise....' " 989 S.W.2d at 170 (quoting 13 JOHN A. APPLEMAN & JEAN APPLEMAN, INSURANCE LAW AND PRACTICE, section 4684 (rev.vol.1976)).

Thus, the duty to defend is distinctly different from the duty to indemnify. The issue of indemnification must await final resolution in court. The broader duty to defend emerges as the insurer gathers facts that may or may not ultimately be proven.

## I. Original and First Amended Petitions:

TIE first claims it had no duty to defend Prairie Framing under its policy because the Rolfes' claims against Prairie Framing in their original and First Amended petitions were excluded from coverage under the "auto" exclusion clause.

Prairie Framing, as the insured, bears the burden of proving coverage. *Am. States Ins. Co. v. Herman C. Kempker Constr. Co.*, 71 S.W.3d 232, 235 (Mo. App.W.D.2002). TIE, as the insurer, had the burden of showing there was an applicable exclusion of coverage under the policy. *Id.* To determine whether TIE had a duty to defend, we begin by comparing the relevant language of the insurance policy with the allegations in the Rolfes' original and first amended petitions, which is undisputed.

### A. Policy Language:

1. **Coverage:** The policy in question provides Prairie Framing business liability coverage as follows:[6]

We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" ... to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily inju-

ry" ... to which this insurance does not apply.

. . . .

This insurance applies to "bodily injury" ... only if:

The "bodily injury" ... is caused by an "occurrence". . . .

Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

2. **"Insured" Defined:** The policy defines the "Insured" under the policy in relevant part as follows:

If you are designated in the Declarations as:

. . . .

A limited liability company, you are an insured.

. . . .

Each of the following is also an insured:

Your "employees" ... but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business.

3. **Liability Definitions:** The relevant liability definitions in the policy are as follows:

"Auto" means a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment.

. . . .

"Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

. . . .

6. For simplification reasons, we have omitted the numbering and lettering of the sections and subsections found in the policy.

"Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

. . . .

"Suit" means a civil proceeding in which damages because of "bodily injury" . . . to which this insurance applies are alleged.

4. **"Auto" Exclusion:** The policy excludes coverage of " 'Bodily injury' or 'property damage' arising out of the ownership, maintenance, use or entrustment to others of any . . . "auto" . . . owned or operated by or rented or loaned to any insured."

**B. Allegations in the Rolfes' Original and First Amended Petitions:** In support of its argument that the Rolfes' claims in their original and First Amended petitions were excluded from coverage under the auto exclusion, TIE highlights the following "Factual Allegations Applicable to All Counts" in the Rolfes' original petition, which remained substantially the same in their First Amended Petition:

20. At the time of and/or immediately prior to the collision, Defendant Winger was performing work duties for his employer, Defendant Prairie Framing.

21. During the hours preceding the collision, Defendant Winger was drinking excessive amounts of alcohol while performing work duties for Defendant Prairie Framing. During the hours preceding the collision, Defendant Winger became intoxicated while performing work duties for Defendant Prairie Framing.

22. Agents, officers, members or employees of Defendant Prairie Framing knew or should have known that Defendant Winger was drinking excessive amounts of alcohol and became intoxicated during work hours on February 17, 1999.

23. Before February 17, 1999, agents, officers, members or employees of Defendant Prairie Framing knew or should have known that Defendant Winger did drink excessive amounts of alcohol and became intoxicated while working for Prairie Framing.

In Count V, the Rolfes alleged Prairie Framing was liable under the theory of respondeat superior because "at the time of the . . . collision, Defendant Winger was acting within the course and scope of his employment for Defendant Prairie Framing." In Count VI, the Rolfes incorporated all other allegations and further alleged, "Defendant Prairie Framing had a duty to Eugene Rolfe to prevent Defendant Winger from operating his motor vehicle when Defendant Prairie Framing knew or should have known that Defendant Winger was intoxicated." They alleged Prairie Framing was independently negligent because:

a. Defendant Prairie Framing retained Defendant Winger in its employment when it knew or should have known Defendant Winger's drinking and driving posed a danger; and/or

b. Prairie Framing LLC was negligent in its supervision of Defendant Winger in that it allowed Defendant Winger to become intoxicated during his work and then drive a vehicle when it knew or should have known Defendant Winger was too intoxicated to drive in a safe manner.

**C. Discussion:** TIE argues that it had no duty to defend Prairie Framing on the Rolfes' original and First Amended Petitions. Specifically, TIE argues that all claims against Prairie Framing and Winger in the petitions rested on Winger's conduct within the scope of his employment or while performing duties related to his em-

ployment for Prairie Framing. And, because Winger is an "insured" under the policy for acts within the scope of his employment or while performing duties related to his employment, and the damages at issue arose from Mr. Winger's use or operation of an auto, the auto exclusion excludes coverage for the Rolfes' claims.

We have compared the policy language with the factual allegations and claims made by the Rolfes in their original and first amended petitions *and* the ascertainable facts. We conclude that the negligent supervision claim in the Rolfes' original and First Amended petitions, which conflicts with and is an alternative to their respondeat superior claim, was potentially within the policy's coverage. Thus, TIE had a duty to defend Prairie Framing under the original and First Amended petitions.

From the outset of the litigation, the Rolfes made independent claims of negligence against Prairie Framing for negligent retention and negligent supervision.[7] Missouri law defines negligent supervision as follows:

A master is under a duty to exercise reasonable care so to control his servant while acting *outside the scope of his employment* as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of harm to them, if

(a) the servant

(i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or

(ii) is using a chattel of the master, and

(b) the master

(i) knows or has reason to know that he has the ability to control his servant, and

(ii) knows or should know of the necessity and opportunity for exercising such control.

RESTATEMENT (SECOND) OF TORTS § 317 (1965) (emphasis added); *see Gibson v. Brewer*, 952 S.W.2d 239, 247 (Mo. banc 1997) (recognizing a negligent supervision cause of action as defined in Restatement (Second) § 317, but refusing to recognize negligent failure to supervise clergy); and *Reed v. Kelly*, 37 S.W.3d 274, 277 (Mo.App. E.D.2000) (citing Restatement (Second) § 317, in defining a negligent supervision cause of action and noting, "this cause of action also requires evidence that would cause the employer to foresee that the employee would create an unreasonable risk of harm *outside the scope of his employment*" (emphasis added)).

We have reviewed the allegations in the Rolfes' original and First Amended petitions. It is clear that their negligent supervision claim was inartfully drafted. As emphasized above, negligent supervision by a master requires a showing that the servant was acting "outside the course and scope of his employment." TIE relies on the Rolfes' factual allegations that Winger was in the course and scope of his employment, which were "applicable to all counts," in arguing that the policy's auto exclusion excludes the Rolfes'˙ damages. TIE also points out that in their negligent supervision claim in Count VI, the Rolfes allege that Prairie Framing negligently supervised Winger "in that it allowed Defendant Winger to become intoxicated *during his work* and then drive a vehicle when it knew or should have known Defendant

---

**7.** The parties focus on the negligent supervision claim, so we do not further discuss the negligent retention claim.

Winger was too intoxicated to drive in a safe manner." Thus, Count VI lacks allegations that Winger was outside the scope of his employment and that he was using Prairie Framing's chattel.[8]

But, the question is not whether the Rolfes stated a claim for relief sufficient to survive a motion to dismiss. Rather, the question is: Did the original and First Amended petitions state enough to potentially or possibly establish coverage under the policy, thereby triggering TIE's duty to defend? We found no Missouri case on point.

▬▬▬ Our interpretation of the test for determining an insurer's duty to defend under Missouri law suggests that as long as the petition demonstrates the potential or possible statement of a claim within insurance coverage, even if inartfully drafted, it triggers the insurer's duty to defend. As explained below, that a third party's claim against an insured would be subject to a motion to dismiss for failure to state a claim is not sufficient for an insurer to shun its duty to defend. The insurer must also consider the facts that were known or reasonably discoverable. The standards are not the same for pleading sufficient facts to invoke a duty to defend and pleading sufficient facts to defeat a motion to dismiss for failure to state a claim. As explained above, to invoke the duty to defend, the allegations, combined with the ascertainable facts, need only establish *potential* or *possible* coverage under the policy. And, an insurer cannot determine its duty to defend solely on the facts alleged in the petition. Rather it must also consider the petition in light of

facts it knew or could have reasonably ascertained. To the contrary,

[A] motion to dismiss for failure to state a cause of action is solely a test of the adequacy of the plaintiff's petition. It assumes that all of plaintiff's averments are true, and liberally grants to plaintiff all reasonable inferences therefrom. No attempt is made to weigh any facts alleged as to whether they are credible or persuasive. Instead, the petition is reviewed in an almost academic manner, to determine if the facts alleged meet the elements of a recognized cause of action, or of a cause that might be adopted in that case.

*Reynolds v. Diamond Foods & Poultry, Inc.,* 79 S.W.3d 907, 909 (Mo. banc 2002). Thus, a motion to dismiss for failure to state a claim focuses solely on the factual allegations in the petition. The court will not resort to extrinsic facts, and allegations suggesting possible or potential liability are not sufficient to withstand a motion to dismiss for failure to state a claim.

Again, the issue is whether the Rolfes' original and First Amended petitions and the facts that TIE knew or could have reasonably ascertained through investigation raise a claim against Prairie Framing "potentially" or "possibly" within the scope of coverage under the policy. Regardless of whether the Rolfes' negligent supervision claim against Prairie Framing was legally sufficient to survive a motion to dismiss for failure to state a claim, when viewed in light of ascertainable facts, it was sufficient to trigger potential coverage under the policy. So, TIE had a duty to

---

8. Perhaps this is the basis for the averment in Prairie Framing's answer to the Rolfes' original petition, filed by Mr. LeFevre, that "the cause of action specifically alleged in Count VI of [the Rolfes'] Petition fails to state a cause of action upon which relief may be granted." TIE also highlights the failure to state a claim in arguing that it had no duty to defend because, without a properly pleaded negligent supervision claim, the remaining claims were excluded by the policy. Yet, it does not appear that a motion to dismiss Count VI was ever filed.

defend Prairie Framing. TIE was then free to demonstrate the invalidity of the claim to the trial court through a motion to dismiss for failure to state a claim, which it did not do.

TIE initially undertook its duty to defend, without reservation, upon the filing of the Rolfes' original petition. It was not until more than seven months later that TIE notified Prairie Framing of its reservation of rights because:

> Indications of fact as well as allegations being presented reflect events that may fall outside the scope of the Businessowners Liability Coverage Form issued to Prairie Farming [sic] LLC; specifically whether Robert Winger was within the scope and course of his employment at the time of the occurrence involved; whether the operation of a motor vehicle involved in the loss falls under the [policy's "auto"] exclusion cited [therein].

In doing so, TIE acknowledged that it was not just bound by the allegations in pleadings but it could and did use additional facts to re-evaluate potential coverage. Of course, just as it attempted to use extrinsic facts to disclaim a duty to defend, TIE cannot close its eyes to extrinsic facts it knew or should have known and simply consider the allegations in the petition in arguing it has no such duty.

The Rolfes may not have sufficiently alleged all specific facts necessary to a negligent supervision cause of action. But, TIE continually learned through discovery of facts raising questions about the nature of the activities involved, including: whether Winger was outside the course and scope of his employment, and, therefore, not an "insured"; the extent of Prairie Framing's acts or omissions in connection with Winger; and whether Winger was using Prairie Framing's chattel. For example:

* In his November 8, 1999 interrogatory answers, Winger answered "No," when asked, "Were you at any time of the occurrence or occurrences forming the basis of this suit performing any job, task or undertaking for any person, firm or corporation other than yourself";

* Winger testified in his May 11, 2000 deposition that it was against Prairie Framing's rules to be intoxicated on the job; that on the date of the accident, he and his crew were no longer able to work because of the snow, so they went to the Pub at around 11:30 a.m.; that he took the crew's tools with him in his truck, which was part of his foreman responsibilities assigned by Prairie Framing; that he, Davenport, and their framing crews spent the afternoon at the Pub taking turns buying pitchers of beers; that Hiesberger joined them around 4:30 or 5:00 p.m.; that he left the Pub around 5:30; and that Davenport and Hiesberger stayed there.

* Davenport testified in his March 15, 2000 deposition that he spent the afternoon drinking beer at the Pub with Winger and the other crew members. When Winger left the Pub, Davenport "[got] the impression [Winger] was [somewhat] intoxicated." When Davenport was asked whether "[he] or anybody else from Prairie Framing [tried] to prohibit [Winger] from driving at that point," Davenport replied, "Hiesberger asked [Winger] if he was all right to drive." Davenport said Winger responded that "he was fine."

* Hiesberger testified in his March 15, 2000 deposition that Prairie Framing expressly forbid alcohol consumption on the job. On the date of the accident, Hiesberger "thought, yes, possibly" that Winger was intoxicated due to the amount of time he had been at the Pub drinking. Hiesberger was asked, "Did you try to keep [Winger] from driving

that night?" Hiesberger answered, "I offered assistance." Hiesberger was then asked what he told Mr. Winger. Hiesberger responded, "I asked [Winger] if he was okay and if we could help him and his reply was 'Don't worry, boss, I'm driving my truck today' as he walked out the door."

* Winger's blood alcohol content was .204% after the accident.

In its April 1, 2000 reservation of rights letter, TIE took the position that Winger was in the course and scope of his employment, so the auto exclusion would exclude coverage under the policy. But Mr. LeFevre told TIE in his April 3, 2000 advice letter that it was an open question as to whether Winger was in the course and scope of employment. Mr. LeFevre also highlighted Prairie Framing's management's direct participation in the drinking activities with Winger before the accident. Furthermore, in its declaratory judgment petition filed November 22, 2000, TIE averred, in the alternative, "Winger is not an insured under the policy as he was not within the scope of his employment by Prairie and he was not performing duties related to the conduct of Prairie's business." This would exclude coverage for *Winger* under the policy but trigger coverage for Prairie Framing against the negligent supervision claim raised by the Rolfes.

**D. *Porterfield:*** TIE argues the auto exclusion above applies to exclude the Rolfes' claims, insisting the question of whether TIE owed Prairie Framing a duty to defend the negligent supervision claims in the original and First Amended Petitions is controlled by this court's holding in *American States Insurance Co. v. Porterfield,* 844 S.W.2d 13 (Mo.App. W.D.1992). We disagree.

In *Porterfield,* an employee of Jerry Porterfield d/b/a Porterfield Construction Company, was driving a truck on 210 Highway pulling a trailer carrying a small tractor. *Id.* at 14. The trailer became unhitched, crossed the divided highway, and collided with the Scarborough family's vehicle, which was traveling in the opposite direction. *Id.* Three members of the Scarborough family were injured in the collision and brought a personal injury action against Porterfield. *Id.* American States insured Porterfield under automobile liability and CGL policies. *Id.*

The Scarboroughs entered into a partial settlement of their claims with Porterfield for the policy limits of his automobile liability policy with American States. They reserved their right "to further pursue Porterfield to the extent of any insurance available under his CGL liability policy with American." *Id.* The Scarboroughs also agreed not to execute against Porterfield or his business. *Id.* Following the court's approval of the partial settlement, American States sought a declaratory judgment that the CGL policy did not provide coverage for the automobile accident. *Id.* American States relied upon CGL policy's exclusion from coverage of " 'Bodily injury' or 'property damage' arising out of the ownership, maintenance, use or entrustment to others of any aircraft, 'auto' or watercraft owned by or rented or loaded [sic] to any insured. Use includes operation in 'loading and unloading.' " *Id.* The trial court agreed there was no coverage for the accident under the CGL policy and granted summary judgment to American States. *Id.*

Porterfield then moved for summary judgment in the Scarboroughs' personal injury suit. Porterfield claimed that the parties' partial settlement limiting the Scarboroughs' recovery to the amount of coverage under the CGL policy, combined with the finding in the declaratory judgment action that the CGL policy did not

provide coverage for the accident, entitled him to summary judgment as a matter of law because there was no genuine issue of material fact. *Id.* The trial court agreed and entered summary judgment for Porterfield. *Id.* The Scarboroughs appealed to this court, raising the sole issue of whether their injuries were covered under the CGL policy, which this court treated as a matter of interpretation of the auto exclusion clause. *Id.*

On appeal, the Scarboroughs argued there was coverage under the CGL policy "because they allege[d] that Porterfield was negligent in the supervision of his employees in the proper method of hitching the trailer to the truck." *Id.* at 15. We interpreted the policy and found otherwise under the plain language of the exclusion. In doing so, we consulted cases holding that "acts such as . . . negligent supervision . . . are merely incidental to the ownership, operation or use of the vehicles involved in the accident and, therefore, are not covered because of [automobile] exclusionary provisions similar to those in the CGL policy here." *Id.* We concluded that the Scarboroughs' "injuries arose out of the use of the truck and not from the negligent supervision and therefore there is no coverage for any injuries arising out of the automobile accident." *Id.* at 16.

TIE argues the current case is indistinguishable from *Porterfield*, at least with respect to the claims against Prairie Framing in the Rolfes' original and First Amended Petitions. Specifically, TIE claims that here, as in *Porterfield*, it was the employee of the insured who negligently drove a vehicle causing injuries to the tort plaintiffs. TIE contends that the auto exclusion excludes coverage because, as in *Porterfield*, the Rolfes' negligent supervision claim was merely incidental to the

ownership, operation or use of the vehicle involved in the accident.

However, the essential facts in *Porterfield* were markedly different than the facts in this case. Here, the use of an automobile was merely incidental to, and independent of, the Rolfes' claim of negligent supervision. In *Porterfield*, there was little doubt that the auto exclusion applied to deny coverage. Clearly, the employee was driving the truck while within the scope of his employment for Porterfield at the time of the accident. Thus, the employee was an "insured" under the terms of the policy. The policy excluded losses arising from the use of an auto operated or owned by an insured. Plain and simple, there was no coverage in *Porterfield*.

Just because an auto is somehow involved in a loss does not automatically mean the auto exclusion applies. The plain meaning of the exclusion still governs the coverage issue. An insured purchases coverage for protection, and the policy will be interpreted to grant coverage rather than defeat it. *Centermark Props., Inc. v. Home Indem. Co.*, 897 S.W.2d 98, 100–101 (Mo.App. E.D.1995). We strictly construe exclusion clauses against an insurer. *Id.* at 101.

As set forth above, the auto exclusion in TIE's policy applies to the ownership or use of an auto by an "insured." As an employee, Winger is an "insured" only for acts within the course and scope of his employment. But, the facts set forth in the pleadings, or known to the parties, indicated that before the accident, Winger had been off duty since 11:30 a.m., drinking in a bar with his supervisors. The accident happened about six hours later, when Winger left the bar in his wife's truck to go home, not to perform work for Prairie Framing. In their answers to all of the Rolfes' petitions, both Winger and

Prairie Framing consistently denied all allegations that Winger was within the scope of his employment when the accident occurred. There was at least the *potential* or *possibility* that there was coverage to protect Prairie Framing on the negligent supervision claim because the auto exclusion did not apply.

Indeed, in their original and First Amended petition, the Rolfes' alleged respondeat superior, an element of which is that Winger was in the course and scope of his employment when the accident occurred. But, they also alleged, in the alternative, that Prairie Framing negligently supervised Winger. This negligent supervision was independent of any claim excluded by the auto exclusion provision in the policy. Prairie Framing contracted and paid consideration for the right to be accorded legal representation by TIE, which right exists even if debatable or alternative theories are alleged in the petition against Prairie Framing.

 Any legal insufficiency of the claim stated in the Rolfes' original and First Amended petitions did not relieve TIE of its duty to defend because Missouri law requires that it also consider the ascertainable facts. These facts gave rise to a conflicting, alternative negligent supervision claim against Prairie Framing. Thus, the original and First Amended petitions, when viewed in conjunction with the ascertainable facts, state at least some grounds of liability covered by the policy of insurance. TIE had a duty to defend Prairie Framing.

## II. Second Amended Petition:

TIE does not directly attack the Second Amended Petition as either not stating a cause of action or not stating a claim covered by the policy. Instead, TIE claims that regardless of whether the Rolfes' Second Amended Petition stated a claim against Prairie Framing within the scope of its insurance coverage, TIE was under no duty to defend Prairie Framing with respect to that petition because Prairie Framing breached its obligations to allow TIE to defend the lawsuit and to cooperate with TIE. In support of its argument, TIE points out that under the policy, Prairie Framing was obligated to:

(1) Immediately send [TIE] copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

(2) Authorize [TIE] to obtain records and other information;

(3) Cooperate with [TIE] in the investigation, or settlement of the claim or defense against the "suit"; and

(4) Assist [TIE], upon [TIE's] request, in the enforcement of any rights against any person or organization that may be liable to the insured because of injury or damage to which this insurance may also apply.

TIE argues Prairie Framing breached these obligations in four ways: First, by consenting to the Rolfes' filing of the Second Amended Petition without first notifying TIE of the requested amendment and without first giving TIE time to consider the affect of such proposed amendment on its defense of Prairie Framing in the lawsuit; second, by entering into the 537.065 Agreement and stipulating to liability before ever seeking TIE's defense against the allegations in the Second Amended Petition; third, by not informing TIE of Prairie Framing's settlement negotiations with the Rolfes until long after the Second Amended Petition was filed and they executed the 537.065 Agreement and stipulation of liability; and fourth, by refusing to accept TIE's offer to defend on the Second Amended Petition unless TIE agreed not to challenge the 537.065 Agreement.

Citing *Cologna v. Farmers & Merchants Insurance Co.*, 785 S.W.2d 691, 701 (Mo. App. S.D.1990), TIE acknowledges Prairie Framing could avoid these obligations if TIE breached its duty to defend, but, TIE continues to insist that it had no such duty. It claims that even if we were to assume for argument purposes that TIE had a duty to defend at some point in the litigation, TIE satisfied that duty by defending Prairie Framing under a reservation of rights until July 11, 2001. We disagree.

We have already held that TIE had a duty to defend Prairie Framing from the outset of the litigation. The issue then becomes: Did TIE breach its duty to defend Prairie Framing, thereby relieving Prairie Framing of its obligations under the policy? We find that TIE did.

 Upon proper notice to the insured, Missouri law permits an insurer to defend its insured but reserve the right to later disclaim coverage. *Safeco Ins. Co. of Am. v. Rogers*, 968 S.W.2d 256, 258 (Mo. App. W.D.1998). The insured then has the option of either accepting the insurer's defense under a reservation of rights or refusing such defense. *Id.* (citing *State ex rel. Rimco, Inc. v. Dowd*, 858 S.W.2d 307, 308 (Mo.App. E.D.1993)). If the fully-notified insured accepts, the insurer's defense under a reservation of rights will not be considered a denial of coverage. *See Brooner & Assocs. Constr., Inc. v. W. Cas. & Sur. Co.*, 760 S.W.2d 445, 447–48 (Mo. App. W.D.1988) (citing *State ex rel. Mid-Century Ins. Co. v. McKelvey*, 666 S.W.2d 457 (Mo.App. W.D.1984)). But, the decision is the insured's, and "[i]nsurers cannot force insureds to accept a reservation of rights defense." *Ballmer v. Ballmer*, 923 S.W.2d 365, 369 (Mo.App. W.D.1996) (citing *McKelvey*, 666 S.W.2d at 459). Should the insured reject the defense, the insurer then has one of three options: "(1) [it] may represent the insured without a reservation of rights defense; (2)[it] may withdraw from representing the insured altogether; or (3)[it] may file a declaratory judgment action to determine the scope of [the] policy's coverage." *Id.* If the insurer chooses (1), i.e. to defend without reservation, it " 'has the opportunity to control the litigation.' " *Id.* (quoting *Rimco*, 858 S.W.2d at 309). If the insurer chooses (3), i.e. files a declaratory judgment action, the "decision ... is a risky one ... [because it] is treated as a refusal to defend an insured, and, if unjustified, the insurer is treated as if it waived any control of the defense [and rights to participate in] the underlying tort action." *Id.* (citations omitted). " 'If its decision concerning coverage is wrong [the insurer] should be bound by the decision it has made.' " *Id.* (quoting *Rimco*, 858 S.W.2d at 309).

As previously set forth in the chronological background of this case, TIE initially assumed the defense of the action and hired counsel to represent Prairie Framing. Then, on April 1, 2000, TIE notified Prairie Framing that because "additional facts and information have been developed," it would thereafter defend "under a full Reservation of Rights." In support of the reservation of rights, TIE cited "liquor liability" and "auto" exclusions and the question of "whether Robert Winger was within the scope and course of his employment at the time of the occurrence." The letter further indicated that TIE could change its position in the case "[s]hould additional factual determinations be revealed." Prairie Framing initially accepted TIE's defense under this reservation of rights.

On November 22, 2000, TIE filed a declaratory judgment action, in which it denied coverage of the claims in the Rolfes' lawsuit and asked the court for a judgment declaring that it "owes no duty to defend or indemnify defendants." TIE claimed

that Winger was not "within the scope of his employment by Prairie," that there was no "occurrence" as defined by the policy, and that the policy's "automobile exclusion" excluded coverage of the damages sought by the Rolfes from Prairie Framing. Then, on February 13, 2001, TIE filed a motion for summary judgment on its declaratory judgment petition. It argued that, as a matter of law, the policy did not provide coverage for any of the three theories of liability pled by the Rolfes against Prairie Framing, i.e., respondeat superior, negligent retention, or negligent supervision. The motion was denied.

On June 19, 2001, Prairie Framing, through counsel, informed TIE that its offer to defend under a reservation of rights was "not acceptable" and gave TIE ten days to admit coverage, or TIE would "not be permitted to participate in the defense of this lawsuit." On July 11, 2001, after TIE failed to respond, Prairie Framing terminated its TIE-hired counsel and hired Mr. Weems to assume full control of its defense against the Rolfes' claims.

 So, as of July 2001, the posture of the case was this: TIE was defending under a reservation of rights and actively pursing a declaratory judgment action against Prairie Framing wherein it denied coverage of all of the claims alleged by the Rolfes against Prairie Framing. Prairie Framing unequivocally rejected TIE's continued defense under the reservation of rights and chose to instead assume responsibility for its own defense. TIE's continued pursuance of the declaratory judgment and its refusal to remove its reservation of rights at Prairie Framing's insistence constituted a refusal to defend. *Ballmer*, 923 S.W.2d at 369. Yet, TIE argues that it was not "unjustified" in reserving its rights and, therefore, it satisfied its duty to defend under the reservation of rights

because questions of coverage did exist. However, for the reasons stated above, we find TIE's refusal to defend unjustified.

 We have already explained above that even if any of the Rolfes' claims were excluded from coverage under the policy, the alternative theory of negligent supervision came within potential policy coverage, thereby triggering TIE's duty to defend. *See Howard v. Russell Stover Candies, Inc.*, 649 F.2d 620, 624 (8th Cir. 1981) (applying Missouri law in explaining that the insurer has a duty to defend where the petitioner relies on alternative and conflicting theories of liability of the insured, one of which is covered while the other is not.) Yet, TIE insists that it did not breach any duty to defend because it had a valid basis for defending under a reservation of rights. As we explained in *Whitehead v. Lakeside Hospital Ass'n*, 844 S.W.2d 475, 481 (Mo.App. W.D.1992):

> Where the claim comes within the policy coverage, and so within the duty of the insurer to defend, the refusal of the insurer to do so is unjustified, and the insurer is guilty of a breach of contract. That the refusal of the insurer to defend on the ground that the claim is outside the policy is an honest mistake, nevertheless constitutes an unjustified refusal and renders the insurer liable to the insured for all resultant damages from that breach of contract. The legal consequences to the insurer from the breach of contract for unjustified refusal to defend on the ground of noncoverage include the loss of its contractual right to demand that the insured comply with certain prohibitory as well as affirmative policy provisions.

(Citation omitted). Having breached the contract, TIE "is treated as if it waived any control of the defense of the underlying tort action." *Ballmer*, 923 S.W.2d at 369. TIE's breach also "relieve[d] [Prairie

Framing] from [the] contract[ual] obligation not to settle" so that it was free to go its own way, and "to make a reasonable settlement or compromise without losing [the] right to recover on the policy." *Cologna*, 785 S.W.2d at 701. At this point, Prairie Framing consented to the filing of the Rolfes' Second Amended Petition (July 31, 2001) and entered into the section 537.065 Agreement with the Rolfes (August 2, 2001).

■■■ But TIE argues that the trial court erred in finding that the uncontroverted facts of this case indicate that the section 537.065 Agreement was executed after TIE refused to provide an unconditional defense, so Prairie Framing was relieved of its obligations under the policy. TIE argues the trial court's finding constitutes error on several grounds. First, TIE argues:

> As a preliminary matter, the holding must be reversed because it is premised upon an inference drawn against TIE, the party against whom summary judgment was entered. Indeed, it is undisputed that TIE's counsel in the DJ action (Casey Griffith) wrote to Prairie Framing's counsel on August 3, 2001, "to confirm" TIE's offer to defend Prairie Framing without reservation against the allegations in the Second Amended Petition. Mr. Griffith's letter of August 3, 2001 does not indicate when it was that TIE made the offer that Mr. Griffith was "confirm[ing]," nor did Prairie Framing address this issue in its cross-motion for summary judgment. Thus, if the time of TIE's offer to defend Prairie Framing is material (as it apparently was to the trial court), TIE was entitled as a matter of law to the reasonable inference that the offer that Mr. Griffith was confirming took place before Prairie Framing executed the Agreement with the Rolfes. The trial court's contrary

inference in favor of Prairie Framing therefore constitutes an error of law. (Citations omitted.)

TIE's argument misstates the nature of TIE's offer to defend and the undisputed facts established in the summary judgment proceedings. As set forth above in the chronological background of this case, TIE did not clearly and unequivocally offer to defend Prairie Framing in its August 3, 2001 letter. *See Cologna*, 785 S.W.2d at 700 (explaining that "[w]hen an insurer has disclaimed coverage and later decides to provide a defense, its readiness and willingness to defend the action must be clearly and unequivocally stated.") Rather, TIE's August 3, 2001 letter expressly states TIE's offer was, "conditional upon the following: (1) Prairie Framing will cease from entering into a [section] 537.065 agreement with the Rolfes or otherwise settling the Rolfes['] claims; and (2) the Rolfes' proposed Second Amended Petition for Damages in the underlying action must be approved by the court and must be filed." The letter further provides:

> If both (1) and (2) above take place, then Truck Insurance Exchange will withdraw its reservation of rights letter, admit that the allegations in the proposed Second Amended Petition for Damages are covered and defend Prairie Framing against said allegations, and will agree to pay your attorneys' fees in representing Prairie Framing.

Prairie Framing had entered into the section 537.065 Agreement the prior day. Even if we are required to draw an inference in favor of TIE that Mr. Griffith orally conveyed the above offer to defend Prairie Framing prior to the Agreement being entered, that offer, which the August 3, 2001 letter was merely "confirm[ing]," was not "clear" and "unequivocal." Thus, Prairie Framing was still in control of its own defense and could enter into the

Agreement. By its conditional offer, TIE was still seeking to control the defense of the action by trying to reverse the effects of Prairie Framing's justified behavior in its own defense after TIE's breach of its duty to defend. Prairie Framing was under *no obligation to accept the conditional offer.*[9]

Second, TIE argues that even if it did not offer to defend the Second Amended Petition until after Prairie Framing executed its Agreement with the Rolfes, TIE's offer still would have satisfied its duty to defend. TIE again concedes that Prairie Framing was excused from its duties under the policy if TIE already was in breach of its duty to defend (a) by July 31, 2001, by which date Prairie Framing had consented to the filing of the Second Amended Petition without notifying TIE or obtaining its consent; or at least by (b) August 2, 2001, when Prairie Framing executed the Agreement with the Rolfes and agreed to stipulate to liability. We have already found TIE had breached its duty to defend by then, so we do not further address this argument.

 TIE also argues that Prairie Framing breached its duty to cooperate with TIE by entering into the 537.065 Agreement with the Rolfes before TIE had a chance to defend against the liability allegations in the Second Amended Petition. In support of its argument, TIE cites the cases of *Dickman Aviation Services, Inc. v. United States Fire Insurance Co.,* 809 S.W.2d 149, 152 (Mo.App. S.D. 1991), *Rocha v. Metropolitan Property & Casualty Insurance Co.,* 14 S.W.3d 242, 247 (Mo.App. W.D.2000), and *Safeco In-*

*surance Co. of America v. Rogers,* 968 S.W.2d 256, 258 (Mo.App. W.D.1998), wherein the courts held that an insured violates the cooperation clause of its insurance policy if it fails "to immediately forward" to its insurer an amended petition containing a new theory of recovery. But, each of these cases involved the insured's failure to forward an amended petition asserting a *new* theory of liability against the insured. TIE acknowledges this distinction but claims it "is irrelevant." We disagree. The holding in each of those cases is specifically based on the fact that the amended petitions alleged *new* theories of negligence that the insurer never was aware of until after a judgment was entered on the new "surprise" theory or theories. *Dickman,* 809 S.W.2d at 152; *Rocha,* 14 S.W.3d at 248; *Rogers,* 968 S.W.2d at 258. Here, the Rolfes' negligent supervision theory was present from the beginning. TIE had an opportunity to and chose not to defend the claim. Instead, TIE relied on the auto exclusion in reserving its rights and seeking a declaratory judgment. The Rolfes did not raise any "new" theories or claims of negligence in their Second Amended Petition, a copy of which TIE received two days before the Rolfes and Prairie Framing entered into the section 537.065 Agreement. Rather, the Rolfes chose to drop the respondeat superior theory and retain their negligent supervision theory, with the addition of factual allegations which were already known to all parties early in the litigation, such as those highlighted above in our discussion of pleading sufficient facts to invoke an insurer's duty to defend versus pleading facts to withstand a motion to

---

9. TIE made two more offers to defend, one on August 7 and the other on August 20, 2001, wherein it continued to contest the validity of the section 537.065 Agreement. On September 5, 2001, Prairie Framing accepted the offer to defend on the issue of damages be-

cause that was the only remaining issue. But, on September 28, 2001, TIE declined the acceptance because the 537.065 Agreement and Prairie Framing's stipulation to liability "greatly undermine[d] [TIE's] ability to defend."

dismiss for failure to state a claim. Despite TIE's argument to the contrary, the amendment did not substantially alter the Rolfes' original theory of recovery regarding the negligent supervision claim such that the amendment would operate to relieve TIE of its duty to defend under the holdings in these cases. If anything, the amendment simply conformed with the facts, which TIE was charged with knowing in initially determining its duty to defend. TIE was not denied a chance to reexamine its coverage position on a "new" theory of recovery.

Thus, once TIE breached its duty to defend, Prairie Framing was relieved of its duties and obligations under the policy. Point I is denied.

### POINT II—TIE'S BREACH OF ITS DUTY TO DEFEND

In its second point on appeal, TIE claims that even if it did have a duty to defend at some point in the proceedings below, it did not breach that duty. Our above resolution of TIE's arguments regarding Prairie Framing's breach of its duties under the policy necessarily required that we determine whether TIE was in breach of its duty to defend. Accordingly, we have already considered and addressed the issues raised by TIE in Point II.

Point II is denied.

### POINT III—DUTY TO INDEMNIFY

In Point III, TIE claims the trial court erred in entering summary judgment on Prairie Framing's indemnity claim because TIE "had no such obligation in that, under the policy, Prairie Framing was under a duty to cooperate with TIE in the defense of the lawsuit and it breached that duty." TIE cites the same alleged breaches by Prairie Framing that we previously discussed. TIE offers no further argument but instead incorporates its arguments previously set out in points I and II. "The duty to indemnify is determined by the facts as they are established at trial or as they are finally determined by some other means, for example through summary judgment or settlement." *McCormack*, 989 S.W.2d at 173. We have previously considered and decided those arguments.

Point III is denied.

### POINT IV—BAD FAITH REFUSAL TO SETTLE

In Point IV, TIE claims the court erred in holding it liable for the full amount of the judgment for two reasons. First, it is only liable for the amount Prairie Framing was "forced to pay," and Prairie Framing was only forced to pay a nominal amount. Second, the evidence did not support the finding, as a matter of law, that TIE acted in bad faith.

Prairie Framing first demanded TIE settle the Rolfes' claims for the policy limits on August 29, 2000. TIE did not respond. Instead, three months later, it filed the declaratory judgment action. On June 19, 2001, Prairie Framing, through independently retained counsel, Mr. Weems, demanded that TIE defend it without reservation of rights. Two days later, the Rolfes demanded settlement of their claim against Prairie Framing for $1,000,000. The Rolfes forwarded the demand to both Mr. Weems and Mr. Lewis, Prairie Framing's TIE-hired counsel. When TIE did not respond to Prairie Framing's June 19th demand, Prairie Framing fired Mr. Lewis by letter dated July 11, 2001. Two weeks later, Prairie Framing sent another letter to TIE demanding that TIE settle immediately within the policy limits. Prairie Framing further informed TIE "should the case go to

trial and a judgment is returned over and above the policy limits, Prairie Framing Company, L.L.C. will seek to recoup such costs from [TIE] based on the tort of bad faith refusal to settle a claim." We have already discussed the ensuing events. Ultimately, the trial court entered summary judgment on the Rolfes' counterclaim in the declaratory judgment action, concluding that TIE acted in bad faith in refusing to settle the Rolfes' claims. Thus, TIE was held liable for the entire $4 million judgment against Prairie Framing.

TIE initially argues that because Prairie Framing is insulated from further liability by the section 537.065 Agreement, Prairie Framing cannot, as a matter of law, maintain an action for bad faith refusal to settle for an amount other than the nominal amount cited as consideration in the Agreement. Specifically, TIE claims that it could only be held liable for the amount in excess of the policy limits that Prairie Framing was actually forced to pay. Prairie Framing responds that because TIE refused to settle, Prairie Framing was denied the benefit of obligations it was entitled to under the policy and now has an unsatisfied $4,000,000 judgment recorded against it—a judgment that Prairie Framing has not been released from by the Rolfes.

■■■ Inherent in a policy of insurance is the insurer's obligation to act in good faith regarding settlement of a claim. This obligation is part of what the insured pays for. We find no attraction to a rule that rewards bad faith by relieving the insurer of excess liability if it forces harsh choices onto an insured facing a huge judgment. When the insurer refuses to settle, the insured loses the benefit of an important obligation owed by the insurer. An insurer's "mere payment" of a judgment up to the policy limits does not make the insured whole or put the insured into the same position as if the company had performed its obligations under the policy. *Landie v. Century Indem. Co.*, 390 S.W.2d 558, 564 (Mo.App.1965). The insurer has no incentive to act in good faith. In fact, if we were to hold as TIE suggests, the insurer could receive a windfall if, to its good fortune, the insured is indigent or is forced into the protection of a bankruptcy or a section 537.065 agreement so that the insured cannot be held legally liable on the judgment. Likewise, requiring a business or individual to pay the judgment before the insurer is held to its obligations due to its bad faith refusal to settle imposes the very burden on the insured that the requirement of good faith seeks to avoid.

Missouri case law on this subject is scarce. Prairie Framing relies on *Ganaway v. Shelter Mutual Insurance Co.*, 795 S.W.2d 554, 563 (Mo.App. S.D.1990), where the court found that the insurer was not absolved of its bad faith refusal to settle and the attendant consequences even though the insured was no longer legally liable on the judgment because he took bankruptcy. The court noted that the insurer's duty to settle in good faith " 'flows from or arises out of the contractual relationship.' " *Id.* at 564 (quoting *Maguire v. Allstate Ins. Co.*, 341 F.Supp. 866, 871 (D.Del.1972)). The duty remained despite the fact that the insured had no further legal liability. *Id.*

On the other hand, TIE relies on *Willcox v. American Home Assurance Co.*, 900 F.Supp. 850, 854 (S.D.Tex.1995), where the insured entered into a settlement agreement with the plaintiffs that released the insured from liability and limited payment of the settlement amount to the proceeds of the insured's insurance policy. The insured also assigned the judgment in excess of the policy limits to the plaintiffs, who then brought suit against the insurer for breach of its duty to settle. *Id.* at 854–55. The court found that the parties' covenant not to execute did not prevent the plain-

tiffs from pursuing their claims against the insurer up to the policy limits. *Id.* at 856. But, the covenant did negate the plaintiffs' right to recover in excess of the policy limits because the covenant prevented any injury to the insured by releasing the insured from liability. *Id.* at 857.

However, *Willcox* involved a claim of negligence against the insurer for failing to exercise the " 'degree of care and diligence which an ordinarily prudent person would exercise in the management of his own business,' " which Texas courts refer to as a "*Stowers* " claim. *Id.* at 858 (quoting *G.A. Stowers Furniture Co. v. Am. Indem. Co.*, 15 S.W.2d 544, 547 (Tex. Comm'n App.1929)). Missouri does not recognize such an action. Instead, Missouri law provides that where an insurer has "acted in bad faith in refusing to settle within the policy limits it [is] liable *in tort,* [ (not negligence or breach of contract) ] to the insured for the entire resulting judgment against the insured, including that part in excess of the policy limits." *Landie*, 390 S.W.2d at 563 (citing *Zumwalt v. Utilities Ins. Co.*, 360 Mo. 362, 228 S.W.2d 750 (1950)) (emphasis added).

Additionally, the *Willcox* court relies on *Whatley v. City of Dallas*, 758 S.W.2d 301, 310 (Tex.App.1988) for its ruling. 900 F.Supp. at 856. But, *Whatley* involved neither negligence nor bad faith. *Whatley* involved the city's alleged breach of a self-administered liability protection plan, under which the city undertook the defense of its law enforcement officers. In fact, *Whatley* specifically left open the potential for an insurer's liability in excess of its policy limits in instances of bad faith or even negligence. 758 S.W.2d at 309–10 ns.5 & 6. The distinction between mere breach of contract or negligence and bad faith is significant. Bad faith goes beyond an honest mistake.

There are other differences. Unlike Prairie Framing's position in our case, the insured in *Willcox* did not have a judgment filed of record against it. 900 F.Supp. at 854. Rather, the insured in *Willcox* was released from the judgment and assigned the judgment to the plaintiffs, who then brought an action against the insurer as a judgment creditor. *Id.* at 854–55. Regardless, to the extent *Willcox* is applicable, we decline the invitation to follow it. TIE's argument that its liability for bad faith refusal to settle is limited to the amount of the judgment Prairie Framing was forced to pay is denied.

Next, we consider TIE's claim that the trial court erred in finding TIE refused to settle in bad faith *as a matter of law*. Under Missouri law, an insurer, "having assumed control of its right to settle claims against the insured, may become liable in excess of its undertaking under the policy provisions if it fails to exercise good faith in considering offers to compromise the claim for an amount within the policy limits." *Ganaway*, 795 S.W.2d at 556. This obligation to act in good faith regarding settlement continues even if an insurer denies coverage and refuses to defend the insured. *Landie*, 390 S.W.2d at 564, 565. When an insurer breaches its duty to consider settlement offers in good faith, the insured is free to then reach a reasonable settlement on his own, which he can then enforce against the insurer. *Hyatt Corp. v. Occidental Fire & Cas. Co.*, 801 S.W.2d 382, 388 (Mo.App. W.D.1990).

As our supreme court explains in *Zumwalt*, 228 S.W.2d at 754, " '[b]ad faith is, of course, a state of mind, indicated by acts and circumstances, and is provable by circumstantial as well as direct evidence. Each case must stand and be determined upon its particular state of facts.' " (Quoting *Johnson v. Hardware Mut. Cas. Co.*, 109 Vt. 481, 1 A.2d 817, 822 (1938)) (citations omitted). For example,

in *Johnson,* 1 A.2d at 822, the court held that the insurer's " 'intentional disregard of the financial interest of [its] insured in hope of escaping the responsibility imposed upon it by its policy' " amounted to bad faith. *Zumwalt,* 228 S.W.2d at 754. Another example is found in *Boling v. New Amsterdam Casualty Co.,* 173 Okla. 160, 46 P.2d 916, 918–19 (1935), where the court found the insurer's actions in seeking to coerce its insured to assume a large part of its liability amounted to bad faith. *Zumwalt,* 228 S.W.2d at 754. The law requires the insurer to " 'act honestly to effectually indemnify and save the insured harmless as it has contracted to do—to the extent, if necessary, that it must make whatever payment and settlement an honest judgment and discretion dictate, within the limits of the policy.' " *Id.* (quoting *Boling,* 46 P.2d at 919).

■ As *Zumwalt* explains, where the insurer's and the insured's interests conflict, an insurer cannot protect its own interests to the detriment of its insured's interests, but instead, the insurer must " 'sacrifice its interests in favor of those of the [insured].' " 228 S.W.2d at 756 (quoting *Tyger River Pine Co. v. Maryland Cas. Co.,* 170 S.C. 286, 170 S.E. 346, 348 (1933)). Here, the trial court decided Prairie Framing's cause of action for TIE's bad faith refusal to settle on the basis of Prairie Framing's cross motion for summary judgment. Clearly, no trial on the merits was held, nor did the parties submit the case to the court for decision on the merits on a stipulation of facts. Rather, the trial court held, as a matter of law, that TIE acted in bad faith.

■ In reviewing the summary judgment we view the record in the light most favorable to TIE, as the non-moving party, and afford it the benefit of all reasonable inferences from the record. *ITT Com. Fin. Corp.* 854 S.W.2d at 376. A lack of genuine dispute regarding material facts plays a role in determining the propriety of summary judgment, but "[t]he key to summary judgment is the undisputed right to judgment as a matter of law; not simply the absence of a fact question." *Id.* at 380. We review de novo, owing the trial court no deference and also must decide the case as a matter of law. *Id.* at 376. This standard of review varies significantly from that in a court-tried case. *See Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976) (in a court-tried case, we must sustain the judgment "unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law").

■ We can envision a fact situation where we could decide as a matter of law that an insurer was guilty of acting in bad faith regarding its refusal to settle. But this is not such a case. As explained in *Zumwalt,* 228 S.W.2d at 754, "[b]ad faith is, of course, a state of mind," so the final determination of the existence of bad faith is generally a fact question. *Accord Ganaway,* 795 S.W.2d at 561. We are unable to hold that the facts in this case establish, *as a matter of law,* TIE's bad faith. In other words, we cannot hold that the facts could lead to no other legal result. Thus, summary judgment was inappropriate on the Defendants' claim of bad faith refusal to settle.

We reverse and remand this portion of Defendants' cross-motion for summary judgment for further proceedings.

## POINT V—REASONABLENESS OF JUDGMENT

■ In Point V, TIE claims that the trial court erred in awarding summary judgment for Prairie Framing "because the amount of the judgment was unreasonable." We disagree.

The Rolfes and Prairie Framing did not agree on the amount of damages in this

case. Instead, they submitted the damages issue to the trial court, which was free to make its own determination as to the amount of the Rolfes' damages. The trial court heard substantial evidence regarding damages. The witnesses presented by the Rolfes were cross-examined.

The Rolfes' evidence presented a compelling story. Mr. Rolfe died a horrible death, flailing and banging on his car window before being engulfed in flames. Witnesses attempting to rescue him helplessly watched him die. This forty-five-year-old man left behind his wife and two boys. Besides being a successful breadwinner ($91,000 salary) for his family, he is a terribly missed role model for his sons and was a close, loving companion to his wife. The Rolfes introduced evidence demonstrating an economic loss of $1,450,000. They also presented evidence establishing that Winger was highly intoxicated after an afternoon of heavy drinking with his co-workers and supervisors. He left the bar and crashed his speeding truck into the rear of Mr. Rolfe's car, causing his death by smoke and thermal inhalation.

The record does not reflect that the trial judge "did anything more than view the evidence as an impartial judicial officer and make his own best judgment as to the amount of damages." *Betts–Lucas v. Hartmann,* 87 S.W.3d 310, 326 (Mo.App. W.D.2002).

Point V is denied.

### POINT VI—POST–JUDGMENT INTEREST

In Point VI, TIE argues that if we reverse any portion of the trial court's judgment, then it is not required to pay post-judgment interest on the entire judgment. Because we are remanding part of the case for further proceedings, the trial court will be obligated to recalculate post-judgment interest, as necessary, depending on the resolution of the remaining issues.

### CONCLUSION

We affirm the trial court's judgment against TIE for Prairie Framing's attorneys' fees, costs, and expenses due to TIE's breach of its duty to defend. We also affirm the trial court's judgment that TIE is required to indemnify Prairie Framing for the judgment obtained against it by the Rolfes. Thus, we direct the trial court to enter judgment against TIE for the policy limits of $1,000,000. Post-judgment interest on the affirmed sum shall be assessed from the date of the original judgment.

We limit our holding to the policy limits because we reverse the trial court's judgment finding that TIE acted in bad faith as a matter of law and is therefore liable for the entire judgment. We remand that issue for further proceedings consistent with this opinion. The trial court's judgment is affirmed in all other respects.