HEARTLAND PAYMENT SYSTEMS, L.L.C., Respondent,

v.

**UTICA MUTUAL INSURANCE COMPANY, Appellant.**

No. ED 84636.

Missouri Court of Appeals,
Eastern District,
Division Four.

Jan. 17, 2006.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 2, 2006.

Steven M. Berezney, Gregory J. Minana, Greg G. Gutzler, St. Louis, MO, for appellant.

Martin J. Buckley, Adrian P. Sulser, St. Charles, MO, for respondent.

LAWRENCE E. MOONEY, Presiding Judge.

Utica Mutual Insurance Company appeals the judgment entered upon a jury verdict for the plaintiff, Heartland Payment Systems, L.L.C., on its claim for insurance benefits against Utica. We affirm.

*Factual Background*

Heartland is a computer processing center that processes credit-card transactions for retail merchants that have contracted with it for credit-authorization services.[1] The instant case and coverage dispute arises out of Heartland's processing credit-card transactions for Golf Concepts, Inc., a company that sold golf clubs through telephone sales orders. Golf Concepts did not have sufficient funds to satisfy all of its customers' refund claims, thus creating uncollectible chargebacks for Heartland.[2] Heartland sought to recover its losses resulting from these uncollectible chargebacks under two insurance policies.

To protect itself against the possibility of chargebacks it could not recover, Heart-

1. Heartland is essentially the middleman between these individual retail merchants and various credit-card companies. When a customer makes a purchase with a credit card, the merchant uses Heartland to obtain verification for the purchase from the credit-card company. The customer's credit-card information is sent to Heartland's computer center, and then relayed to the credit-card company to obtain authorization for the purchase. Once the purchase is authorized or declined, that information is then sent back from the credit-card company to Heartland, and from Heartland back to the merchant. After a purchase is approved, Heartland deposits funds in the merchant's account and then ultimately collects payment from the credit-card company.

2. As part of processing credit-card transactions, Heartland processes chargebacks on behalf of the bank or financial institution issu-

ing the credit cards. If a customer protests a credit charge on their statement, and the merchant declines to refund their money, the customer can lodge a complaint with the bank that issued the credit card and ask the bank for credit. When this occurs, the issuing bank generates a chargeback, crediting the customer's account. The amount is then deducted from the sums the credit-card company pays to Heartland. It is then up to Heartland to receive reimbursement from the merchant. To do so, Heartland may either deduct the amount from the merchant's next deposit or it may debit the merchant's bank account. If there are insufficient funds to cover the chargeback, an account receivable is created. An account receivable becomes an uncollectible chargeback when Heartland determines it cannot recover that sum from the merchant.

land had procured two insurance policies, one from Utica and one from BancInsure, Inc. The indemnity policy issued by Utica, denominated as a Merchant Chargeback Indemnity Policy, provided coverage, subject to the terms and conditions of the policy, for "losses"[3] sustained by Heartland caused by certain "covered acts"[4] of Golf Concepts. The policy had an overall annual aggregate limit of indemnity of $1.2 million dollars, with no deductible. The policy contained an "other insurance" clause, which stated that "[i]f any other insurance or indemnity covering any 'loss' covered by this policy is available to the Insured, this policy shall only apply to that part of such 'loss' which exceeds the amount recoverable from such other insrurance [sic] or indemnity."

Under the BancInsure policy, denominated as "Plastic Card Fraud Policy for Financial Institutions," BancInsure agreed to indemnify Heartland for the following: merchant fraud, merchant's customer fraud, electronic terminal fraud, telephone sales and mail-order merchant fraud, and telephone sales and mail-order merchant's customer fraud.[5] The policy had an aggre-

3. Utica's policy defined a loss, in part, as follows: a "monetary loss sustained by the insured as a direct result of an 'uncollectible chargeback' occurring on or after the 'retroactive date,' if any...."

4. Utica's policy defined a "Covered act," as the following acts committed by a "merchant":

(1) Failing to reimburse a cardholder following nondelivery of a product to such cardholder;
(2) Processing mail order transactions not authorized by the Insured;
(3) Processing telephone order transactions not authorized by the Insured;
(4) "Factoring" of "bank card" transactions;
(5) Misappropriating cardholder funds on deposit with the "merchant";
(6) Making material misrepresentations in a merchant application to the Insured;
(7) Processing "bank card" transactions not authorized by a cardholder;
(8) Using deceptive or misleading methods to solicit funds form a cardholder; or
(9) Use of counterfeit, lost or stolen credit numbers by "merchants."

5. These are set out in BancInsure's policy:

A. **MERCHANT FRAUD**
Loss resulting directly from the Insured's Uncollectible chargeback, or series of Uncollectible chargebacks, to a Merchant to the extent that the chargeback, or series of chargebacks, is the result of fraud perpetrated on the Merchant by the Merchant's customer involving the use of Plastic Cards, but only when the chargeback is uncollectible because the Merchant is a debtor in Bankruptcy.

B. **MERCHANT'S CUSTOMER FRAUD**
Loss resulting directly form the Insured's Uncollectible chargeback, or series of Uncollectible chargebacks, to a Merchant to the extent the chargeback, or series of chargebacks is the result of fraud perpetrated on the Merchant by the Merchant's customer involving the use of Plastic Cards, but only when the chargeback is Uncollectible because the merchant is a debtor in Bankruptcy.

C. **ELECTRONIC TERMINAL FRAUD**
Loss resulting directly form the fraudulent use of a Plastic Card at an Electronic Terminal.

D. **TELEPHONE SALES AND MAIL ORDER MERCHANT FRAUD**
Loss resulting directly from an Uncollectible chargeback, or series of Uncollectible chargebacks, to a Merchant to the extent the chargeback, or series of chargebacks, is the result of fraud committed by the telephone sales and/or mail order Merchant(s) involving the use of a Plastic Card.

E. **TELEPHONE SALES AND MAIL ORDER MERCHANT'S CUSTOMER FRAUD**
Loss resulting directly from the insured's Uncollectible chargeback, or series of Uncollectible chargebacks, to a Merchant to the extent the chargeback, or series of chargebacks, is the result of fraud perpetrated on the telephone sales and/or mail order Merchant by the telephone sales and/or mail order Merchant's customer involving the use of Plastic Cards, but only when the chargeback is Uncollectible because the telephone sales and/or mail order Merchant is a debtor in Bankruptcy.

gate limit of liability of $10 million dollars, with a single-loss deductible of $500,000. BancInsure's policy also contained an "other insurance" clause, which stated, in pertinent part, that "[c]overage afforded hereunder shall apply only as excess over any valid and collectible insurance or indemnity obtained by the Insured. . . ."

Heartland filed proofs of losses with both Utica and BancInsure. In its proof of loss submitted to Utica, Heartland claimed a loss of outstanding chargebacks for returns and non-delivery of golf clubs in the amount of $528,899.17. This proof of loss was subject to amendment, and Heartland filed a second proof of loss with Utica some six months later. In this second proof of loss, Heartland claimed $1,054,000 in uncollectible chargebacks as a result of Golf Concepts' acts.[6]

After investigation, Utica informed Heartland that it had concluded that Golf Concepts committed covered acts under the policy. Utica further acknowledged that Heartland had provided Utica with data establishing that, to date, the total overdraft balance was $1,473,270.44. Utica took the position that, because of the effect of the two "other insurance" clauses in the Utica and BancInsure policies, it was responsible for only a portion of the covered losses Heartland had sustained. Utica asserted that BancInsure's policy applied on a pro-rata basis with its indemnity policy for any loss in excess of the $500,000 deductible in the BancInsure policy. Based on this position and its construction of the two insurance policies, Utica calculated that it owed Heartland $519,473.80, and tendered a check for that amount.

Heartland also made a claim under the BancInsure policy for the uncollectible chargebacks on the Golf Concepts account. In the proof of loss submitted to BancInsure, Heartland claimed a total loss in the amount of $1,473,957.44 as a result of Golf Concepts' various fraudulent acts. BancInsure declined to make any payment.

Heartland filed suit against Utica and BancInsure. In its action against Utica, Heartland alleged it had sustained losses in excess of $1,293,024.14 as a result of the acts of Golf Concepts.[7] Heartland claimed that Utica was obligated to pay the full policy limit and sought to recover the remaining balance of Utica's $1.2 million limit of liability—$680,526.20—plus interest. As against BancInsure, Heartland alleged it had sustained losses in excess of $1,293,024.14 as a result of certain fraudulent acts by Golf Concepts. Heartland sought indemnification from BancInsure for all losses caused by the fraudulent acts of Golf Concepts in excess of the $1.2 million limit insured by Utica, up to BancInsure's policy limit of liability of $10 million dollars.

In addition to filing answers, both Utica and BancInsure filed cross-claims against each other. In BancInsure's cross-claim against Utica, BancInsure argued that under its "other insurance" clause, its policy provided coverage only in excess of that provided by Utica. BancInsure sought declaratory relief from the court stating that

---

**6.** Heartland asserted that Golf Concepts had engaged in the following covered acts under Utica's policy: (a) failing to reimburse cardholders following nondelivery of products to such cardholders; (b) misappropriating cardholder funds or deposits with the merchant; (c) making material misrepresentations in a merchant application to the insured; (d) processing bank-card transactions not authorized by cardholders; and (e) using deceptive or misleading methods to solicit funds from a cardholder.

**7.** According to testimony at trial, the total chargebacks eventually totaled $1.8 million dollars.

it had no liability until Utica's policy was exhausted. In its cross-claim against BancInsure, Utica sought declaratory relief, indemnity, and contribution. Utica claimed that because Heartland was covered under both the Utica and BancInsure policies for the same claim, payment was subject to proration between Utica and BancInsure. Utica sought declaratory relief so stating, and also sought contribution and indemnity from BancInsure on the same grounds.

After a period of discovery, various motions for summary judgment were filed by both Utica and BancInsure.[8] Among these motions was BancInsure's motion for partial summary judgment on the issue of primary versus excess coverage. In this motion, BancInsure requested the trial court to enter judgment finding that the Utica policy was the primary insurer of the losses claimed by Heartland as a result of the chargebacks incurred on the Golf Concepts account and that BancInsure coverage is excess only for those specific losses that resulted from fraud. In denying this motion, the trial court ruled that "both policies identify and cover the same risk, i.e., loss to Heartland resulting from acts of fraud committed by Golf Concepts." The trial court further noted that under Missouri law, although "other insurance" clauses are enforceable, when two policies cover the same risk and contain closely similar "other insurance" clauses, the clauses are not enforced, and each insurer is liable for its pro-rata share of the loss based upon a comparison of the policy limits. The trial court also ruled that with respect to the Golf Concepts claim, the insurance policies issued by BancInsure and Utica afforded Heartland concurrent coverage.

Just prior to trial, Heartland and BancInsure settled, with Heartland receiving $326,724.90 for the losses it suffered on the Golf Concepts account.[9] Heartland then proceeded to trial on its claim against Utica. Heartland filed a pretrial motion *in limine* to prevent Utica from presenting any evidence that Heartland was covered by the BancInsure policy and to prevent Utica from introducing any evidence or argument that since there was concurrent coverage, Utica's policy provided coverage for only a portion of Heartland's losses. In support of its motion, Heartland claimed that because Utica was attempting to disclaim certain amounts of coverage as being concurrently covered under another policy, and because the policy issued by Utica provided coverage even in the absence of fraud on the part of Golf Concepts, that Utica thus had the burden of proving which transactions and losses were the result of fraud, and therefore subject to proration with the BancInsure policy. Heartland further claimed that Utica was required to present expert testimony to show which chargebacks were the result of fraud, and that because Utica failed to designate any experts, it could not support any argument that there were losses for which there was concurrent coverage. The trial court granted Heartland's motion and sustained Heartland's subsequent trial objections to the introduction of evidence and argument of the existence of the BancInsure policy.[10]

8. The trial court denied all motions for summary judgment.

9. BancInsure dismissed its cross-claim against Utica. We reject Heartland's argument that Utica had abandoned its cross-claim against BancInsure. Utica dismissed its cross-claim against BancInsure after the notice of appeal was filed, thereby disposing of all counts and claims and vesting this Court with jurisdiction.

10. The trial court entertained Utica's offer of proof with respect to the court's ruling on Heartland's motion in limine at the close of

The jury returned a verdict in Heartland's favor, awarding Heartland $680,526.20, the full amount Heartland was seeking. This amount, when combined with the amount already paid by Utica, totals $1.2 million—the overall aggregate limit of Utica's policy. The trial court entered judgment in accordance with the jury's verdict and denied Utica's post-trial motions. Utica now appeals.

## Discussion

Utica raises three points on appeal. First, Utica alleges the trial court erred in ruling that the proofs of loss were not sufficient evidence of Golf Concepts' fraud. In a related claim, Utica next alleges that even if it was required to produce evidence on fraud other than the proofs of loss, the trial court erred in ruling that Utica was required to produce expert testimony on the issue of fraud. And third, Utica claims the trial court erred in precluding it from presenting evidence of BancInsure's settlement. Although Utica raises three separate points on appeal, the underlying argument for each point is essentially the same. Utica complains that it was forced to pay more than its pro-rata share of Heartland's losses.

 Utica's position that it is only liable for its pro-rata share of Heartland's losses is based on its interpretation of the two policies at issue in this case, and on its application of a general rule governing "other insurance" clauses.[11] Under that general rule, "when two policies both con-

tain similar 'other insurance' clauses, the clauses are treated as mutually repugnant and are disregarded." *Federal Insurance Company v. Gulf Insurance Company*, 162 S.W.3d 160, 164 (Mo.App. E.D.2005) *citing Arditi v. Massachusetts Bonding & Insurance Co.*, 315 S.W.2d 736, 743 (Mo.1958). In this situation, the losses are prorated between the insurers as though neither policy had an "other insurance" clause. *Federal Insurance*, 162 S.W.3d at 164; 15 Couch on Insurance 3d *Contribution and Apportionment* § 219.47.

In this case, the Utica and BancInsure policies both contained "other insurance" clauses. Although expressed in different ways, the meaning and intent of each clause is the same—if there exists other insurance covering the loss, the insurer will only provide excess coverage over the limits of the other policy. Because the Utica and BancInsure policies contain like excess "other insurance" clauses, the provisions are mutually repugnant, and the clauses are to be disregarded. Neither policy contains any further "other insurance" provisions purporting to limit their liability. Accordingly, Heartland's losses are to be prorated between Utica and BancInsure in proportion to the amount of coverage by their respective policies. *See Federal Insurance*, 162 S.W.3d at 164; 15 Couch on Insurance 3d *supra* § 219.47.

 That the losses here are prorated between Utica and BancInsure is of no benefit, however, to Utica on its current claims of trial-court error in the exclusion

---

all evidence. Utica offered both the BancInsure policy and the proof of loss submitted by Heartland to BancInsure. The trial court received Utica's offer of evidence, but again sustained Heartland's motion.

11. "Other insurance" clauses are provisions inserted in insurance policies to vary or limit an insurer's liability when additional, concurrent insurance exists to cover the same loss.

*Planet Insurance Company v. Ertz*, 920 S.W.2d 591, 593 (Mo.App. W.D.1996). Three basic types of "other insurance" clauses are utilized: pro-rata clauses that limit the insurer's liability to a proportion of the total loss; excess clauses that make the policy excess or payable after other policies; and escape clauses that allow the insurer to escape all liability. *Id.*

of evidence regarding the BancInsure policy. Utica asserts that it planned to introduce evidence of BancInsure's concurrent coverage in order to limit damages to Utica's pro-rata share. Utica argues that without this evidence, it had no opportunity to present its defense of pro-rata liability, or its entitlement to a set-off. And thus, Utica complains that it was forced to pay well over its pro-rata share—an amount much greater than it contracted to pay. Utica's argument is fundamentally flawed. A pro-rata allocation among insurers is just that—an allocation among the various insurers. This must be distinguished from the insurer's relationship with its insured. "A pro-rata allocation among insurers does not reduce their respective obligations to their insured." *Dart Industries, Inc. v. Commercial Union Insurance Company,* 28 Cal.4th 1059, 1071, 124 Cal.Rptr.2d 142, 152, 52 P.3d 79, 87 (2002). When multiple policies are triggered on a single claim, and liability apportioned among multiple insurers, that apportionment has no bearing upon the insurers' obligation to the policyholder. *Id.* The insurers' obligation to the policyholder is to cover the full extent of the policyholder's liability, up to the policy limits. *Id.* And, likewise, while an insured's right of recovery is restricted to the actual amount of its loss, this does not bar it from demanding full coverage from each insurer, as long as its demand is made in good faith. *Fireman's Fund Insurance Company v. Maryland Casualty Company,* 65 Cal.App.4th 1279, 77 Cal.Rptr.2d 296, 305 n. 5 (1998) *citing* 16 Couch on Insurance 2d *Contribution and Apportionment* § 62:1.

And so, here, even though Heartland's losses are to be prorated between Utica and BancInsure, Utica remained contractually obligated to Heartland under its policy to cover the full extent of Heartland's covered losses, up to the policy limit. Utica sought to introduce evidence regarding BancInsure's concurrent coverage, in an effort to limit damages and reduce the amount Heartland could recover from Utica. In this case, however, such evidence of BancInsure's concurrent coverage was irrelevant and properly excluded.[12]

To the extent Utica has paid more than its pro-rata share, it may yet have a remedy. Utica may have a right to assert a cause of action against BancInsure for equitable contribution. Equitable contribution is the right to recover from a co-obligor who shares liability with the party seeking contribution. *Fireman's Fund,* 77 Cal.Rptr.2d at 303. The right to contribution arises when several insurers are obligated to indemnify the same loss, and one insurer has paid more than its share of the loss. *Id.* Where multiple insurance carriers insure the same insured and cover the same risk, each insurer has independent standing to assert a cause of action against its coinsurers for equitable contribution when it has undertaken the indemnification of the common insured. *Id.* The right of contribution permits reimbursement to the insurer that paid on the loss for the excess it paid over its proportionate share of the obligation. *Fireman's Fund,* 77 Cal.Rptr.2d at 303; 15 Couch on Ins.3d, *supra* § 217.4; *see also, Federal,* 162 S.W.3d at 164. In order to have a right of contribution on the ground of concurrent insurance, the insurance provided by each must cover the same insured, the same interest, and the same risk. *Hartford Acc. & Indem. Co v. Western Cas. & Sur. Co.,* 712 S.W.2d 722, 724 (Mo.App.

---

**12.** In so holding, we note that this Court is primarily concerned with the correctness of the trial court's result. *See Trimble v. Pracna,* 167 S.W.3d 706, 716 (Mo. banc 2005), and thus, do not reach Utica's specific allegations of trial-court error.

E.D.1986). Here, the insurance provided by Utica and BancInsure both covered the same insured, Heartland. Both policies identified and covered the same risk, and afforded Heartland concurrent coverage. Accordingly, Utica may yet have a cause of action against BancInsure for equitable contribution to recover any amounts Utica paid on Heartland's losses in excess of its proportionate share of the obligation.[13]

The judgment is affirmed.

MARY K. HOFF and BOOKER T. SHAW, JJ., concur.

---

**13.** BancInsure is free to answer and defend such a suit with any argument that is not precluded by the holdings of this appeal.