**MISSOURI PUBLIC ENTITY RISK MANAGEMENT FUND, Appellant,**

v.

**AMERICAN CASUALTY COMPANY OF READING, Pennsylvania, Respondent.**

**No. WD 75446.**

Missouri Court of Appeals, Western District.

April 30, 2013.

Michael G. Berry, Jefferson City, MO, for appellant.

David P. Ellington, Kevin J. Adrian and Teresa M. Young, St. Louis, MO, for respondent.

Before Division One: GARY D. WITT, Presiding Judge, THOMAS H. NEWTON, Judge and MARK D. PFEIFFER, Judge.

GARY D. WITT, Judge.

Missouri Public Entity Risk Management Fund ("MOPERM") sued American Casualty Company ("ACC") on claims arising out of the settlement of a wrongful death action. MOPERM sought "a declaration as to the amount of ACC's obligation to contribute toward settlement" and judgment in that amount "for the value of the benefit conferred upon ACC." In an amended petition, MOPERM alleged three separate theories of recovery: unjust enrichment, equitable contribution, and equitable subrogation. Both parties filed cross-motions for summary judgment. The trial court entered summary judgment in favor of ACC on all counts, and MOPERM appeals. We reverse and remand.

### FACTUAL AND PROCEDURAL HISTORY [1]

This lawsuit arose after a settlement involving MOPERM regarding a wrongful death claim brought against a nursing home and six of its employees. In the wrongful death action giving rise to the settlement, the son and estate of a deceased patient sued after the patient had injured her neck and died due to a bathroom fall and was determined to have had excessive morphine in her system. The plaintiffs in that action sued all seven defendants for joint and several liability.

---

1. On review of summary judgment, we view the record in the light most favorable to the party against whom the judgment was entered. *Hill v. Gov't Emp. Ins. Co.,* 390 S.W.3d 187, 188 n. 1 (Mo.App. W.D.2012). "All reasonable inferences are given to the non-movant." *Id.*

MOPERM is an entity created by the State of Missouri pursuant to sections 537.700 to 537.756,[2] and it was formed to provide liability coverage for local governments and their officers and employees when engaged in their official duties. MOPERM functions like a liability insurance carrier and issues to each insured a "memorandum of coverage."

MOPERM provided primary liability coverage for six of the defendants: five individual defendants and the nursing home. ACC,[3] a private insurance company, provided primary liability coverage for the seventh defendant, a charge nurse ("Nurse"), with a policy limit of $1,000,000 per claim. MOPERM provided excess coverage for Nurse, in addition to its primary coverage for the additional six defendants, and its total limit of coverage was $2,000,000 per occurrence. ACC provided no coverage, primary or excess, to the other six defendants.

MOPERM and ACC agreed to provide a joint defense to Nurse in the wrongful death action, and ACC funded a portion of the cost. The defense counsel ("Joint Counsel") represented all of the defendants in the underlying action. Early in the case and before the defendants were obligated to answer discovery, Joint Counsel[4] received a settlement demand as to all claims against all defendants for a lump sum of $450,000.

Contemporaneous with the settlement demand, Joint Counsel also gave MOPERM and ACC a summary of Joint Counsel's investigation into the claim, which disclosed that: (1) Nurse admitted she falsified training records for the certi- fied nurse assistants at the home; (2) Nurse falsely verified training records showing that other defendants had received 16 hours of training, when in fact their training was only "10 to 12 hours"; (3) Nurse "reviewed" and "signed off" on medication records of the patient in question without discovering that the deceased patient was overdosed with morphine; (4) the medications technician who was responsible for calculating the morphine dosage that the deceased received "was not properly trained in dosage calculations and in fact miscalculated the dosage of morphine given to [the deceased]"; (5) Joint Counsel could not confirm whether Nurse also trained the medications technician involved, but Nurse "is responsible for training some med techs"; and (6) the death certificate showed that the death was caused by "morphine and fentanyl intoxication" and a "fracture" to the deceased's neck. Because discovery was not yet due to plaintiffs, they appeared to be unaware of many of these damaging facts when they made the settlement demand.

Joint Counsel provided MOPERM and ACC the following opinion and information about damages and settlement value: Nurse's admissions about falsifying training records "will double the jury appeal and therefore, double the value" of the wrongful death case; the family's legal counsel would likely increase settlement demand as time invested in the suit increased; $450,000 was a reasonable starting point; the family knew about two defendants attempting to cover up the deceased fall; the family did not know yet about Nurse's role in falsifying training records, did not know about

---

2.  All statutory references are to RSMo 2000 as supplemented unless otherwise indicated.

3.  ACC is sometimes referred to as CNA in the record.

4.  The parties before this Court omitted the names of Joint Counsel, the plaintiff, the deceased, and the various defendants from the underlying wrongful death action; therefore, we are not able to refer to them by name.

Nurse approving incorrect medication dosages, and did not know that Nurse may have been responsible for training the medication technician that incorrectly calculated the morphine dosage. Joint Counsel indicated that it was imperative to get a settlement in place as soon as possible to "stop all discovery." Joint Counsel asked MOPERM and ACC for authority to settle for a maximum of $400,000. Nurse's separate counsel, around this same time frame, made a written demand that ACC "exercise all diligent and good faith efforts to accomplish settlement of the claims asserted against [Nurse] within the applicable policy limits."[5]

After this report from Joint Counsel, but before the settlement was finalized, MOPERM and ACC exchanged electronic communication as to how the two companies would apportion their respective liability under any settlement. Because the suit for wrongful death alleged joint and several liability as to all defendants, MOPERM argued that ACC was liable for half of the settlement even though Nurse was one of seven defendants. MOPERM's claims representative based that figure on a telephone conference with the Joint Counsel, who stated that Nurse was fifty percent at fault, in large part because Nurse was a professional and the remaining individual defendants were aids and were "more of the uneducated, low paid, and they would maybe hold [Nurse] to a higher standard."

ACC wrote to MOPERM that it was defending Nurse on a reservation of rights and planned to deny coverage based on exclusions within the policy issued to Nurse. ACC stated that "issues revolving around [Nurse's] coverage should not prevent you from resolving this case if MOPERM feels this is appropriate." ACC also wrote that MOPERM had "over-evaluated [Nurse's] role in the case" and that *"this is a case for MOPERM to resolve"* (emphasis added). ACC also indicated that language in Nurse's policy *"raises questions whether this policy is primary for MOPERM"* (emphasis added).[6] ACC ultimately offered $75,000 to be applied toward any settlement. Two days before ACC wrote this email, however, ACC's coverage counsel had determined and notified ACC that a coverage suit with MOPERM would probably result in a finding that ACC provided primary coverage for Nurse and that this claim was covered by the policy.

Later that month, ACC requested MOPERM to report "where we are regarding settlement of the case" and MOPERM responded that the case had been finally settled for a lump sum of $350,000 for all defendants. ACC responded that it was "pleased to hear that this matter has been resolved. Please send me a copy of proposed settlement documents and advise of detail of payment on behalf of [Nurse]." MOPERM responded that it had not changed its position that ACC owes fifty percent of the settlement, which amounted to $175,000, and wrote: "If you are not in agreement with that split, please contact me so we can discuss how we are going to resolve this issue."

When an agreement could not be reached, MOPERM filed this suit against

---

5. It is unclear from the record, but it is assumed that Nurse was personally paying this separate counsel to protect her individual interests and potential personal liability in the event of a judgment against her that exceeded the available insurance coverage.

6. Interestingly, throughout the settlement process and even after the current action was filed, ACC took the position that MOPERM held the primary coverage for Nurse and it was not until ACC filed its summary judgment motion that it abandoned this position.

ACC the day before the release settling the underlying wrongful death action was executed and filed of record. In its suit, MOPERM sought "a declaration as to the amount of ACC's obligation to contribute toward settlement" and sought judgment in that amount "for the value of the benefit conferred upon ACC." In an amended petition, MOPERM alleged theories of unjust enrichment, equitable contribution, and equitable subrogation. Both parties filed cross-motions for summary judgment, and the court granted summary judgment in favor of ACC on all counts, without any analysis or reasoning for its decision. MOPERM appeals.

## STANDARD OF REVIEW

"The standard of review of appeals from summary judgment is essentially de novo." *Lafarge N. Am., Inc. v. Miller*, 375 S.W.3d 852, 854 (Mo.App. W.D.2012) (citations omitted). We "will review the record in the light most favorable to the party against whom judgment was entered." *Id.* Summary judgment shall be entered if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Rule 74.04(c)(6). "A 'genuine issue' is a dispute that is real, not merely argumentative, imaginary or frivolous." *ITT Commercial Fin. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 382 (Mo. banc 1993).

## ANALYSIS

In its two points on appeal, MOPERM claims that the trial court erred in entering summary judgment in favor of ACC and that MOPERM is entitled to judgment against ACC as a matter of law. MOPERM argues that because ACC failed to either pay an amount which was within ACC's coverage or to tender its insured an unqualified defense, ACC breached its duty to the insured, giving rise to a right of (1) equitable subrogation, (2) unjust enrichment, and (3) equitable contribution by MOPERM against ACC.

## Duty to Defend, Duty to Settle in Good Faith, Duty to Indemnify

■ To understand the merits of the claims, we begin by briefly exploring sources of ACC's potential liability. Though ACC argued initially that it was not the primary insurer for Nurse but was an excess carrier and that MOPERM was the primary carrier for Nurse, it finally withdrew this issue during the summary judgment proceeding and acknowledged that ACC was the primary coverage carrier for Nurse. "An insurance company has a duty to defend an insured when the insured is exposed to potential liability to pay based on the facts known at the outset of the case, no matter how unlikely it is that the insured will be found liable and whether or not the insured is ultimately found liable." *Truck Ins. Exchange v. Prairie Framing, LLC*, 162 S.W.3d 64, 79 (Mo.App. W.D.2005) (quoting *McCormack Baron Mgmt. Servs., Inc. v. Am. Guar. & Liab. Ins. Co.*, 989 S.W.2d 168, 170 (Mo. banc 1999)). ACC's duty to defend Nurse is uncontroverted at this time.

■ There is some question as to whether ACC met its duty to its insured, given that it did partially fund the joint defense. But, notwithstanding the partial funding of the Joint Counsel, the record indicates that ACC abandoned Nurse during a crucial time in settlement negotiations. ACC exited itself even as a settlement offer was made within the coverage limits, Joint Counsel recommended a settlement as quickly as possible before certain damaging discovery was due, and at the same time, Nurse's separate counsel demanded that ACC "exercise all diligent and good faith efforts to accomplish settle-

ment of the claims asserted against [Nurse] within the applicable policy limits."

■ "Inherent in a policy of insurance is the insurer's obligation to act in good faith regarding settlement of a claim." *Truck Ins.*, 162 S.W.3d at 93. If ACC had deemed the proposed settlement on behalf of Nurse unreasonable, ACC could have rejected the proffered amount and continued to pursue a defense on behalf of Nurse independently. However, ACC neither participated in settlement negotiations nor pursued a defense independently. Instead, ACC refused to cooperate and permitted an excess insurer (MOPERM) to make binding decisions about ACC's insured's liability, forcing the excess insurer to indemnify ACC's insured in its stead. "[W]here the insurer's and the insured's interests conflict, an insurer cannot protect its own interests to the detriment of its insured's interests, but instead, must 'sacrifice its interest in favor of those of the insured.'" *Id.* at 95 (citations omitted). In light of Joint Counsel's belief that impending discovery responses would have drastically impacted the amount of any settlement demand, time was of the essence; ACC sat on its hands. Ultimately, ACC paid no portion of the liability on behalf of Nurse.

Given these facts, whether ACC breached its duty to indemnify or other duties is an open factual issue for the fact finder to decide. For reasons explained below, we see the factual questions as important in the resolution of the issues presented.

### Equitable Subrogation

■ Unjust enrichment is related to the doctrine of equitable subrogation. "Subro-

gation exists to prevent unjust enrichment." *Keisker v. Farmer*, 90 S.W.3d 71, 75 (Mo. banc 2002). When based on contract, it is often known as conventional subrogation.[7] *Messner v. Am. Union Ins. Co.*, 119 S.W.3d 642, 649 (Mo.App. S.D. 2003); *Am. Nursing Res., Inc. v. Forrest T. Jones, Inc.* 812 S.W.2d 790, 798 (Mo. App. W.D.1991) (right of subrogation there not founded on contract but created in equity to enforce right of restitution and so prevent unjust enrichment). Subrogation is broadly defined as the "right of one, not a volunteer, who pays another's debt, to recover the amount paid, which in good conscience should be paid by the one primarily responsible for the loss." 4 New Appleman Law of Liability Ins. § 42.01 (2012) (citing *State ex rel. McCubbin v. McMillian*, 349 S.W.2d 453, 459 (Mo.App. 1961)).

"There is no general rule regarding when the doctrine of equitable subrogation applies." *Ethridge v. TierOne Bank*, 226 S.W.3d 127, 134 (Mo. banc 2007). "Its application depends on the facts of the case." *Id.* "When insurance companies are unable to agree which is primary, the insured should not be left to litigate the issue. The preferable solution is for one of the insurers to pay the claim and then pursue a subrogation action." 4 New Appleman § 41.04. *See also Royal Ins. Co. of Am. v. Caliber One Indem. Co.*, 465 F.3d 614, 619 (5th Cir.2006) ("Under the doctrine of equitable subrogation, 'an excess insurer, paying a loss under a policy, "stands in the shoes" of its insured with regard to any cause of action its insured may have against a primary insurer re-

---

**7.** Though MOPERM sued under the doctrine of equitable subrogation, there was, in fact, a subrogation clause in the memorandum of coverage between Nurse and MOPERM providing that "in the event of any payment

under this memorandum, MOPERM shall be subrogated to the Covered Party's rights of recovering therefore against any person or organization." However, neither party raises this as an issue and we do not address it.

sponsible for the loss.'"); *Great Plains Mut. Ins. Co., Inc. v. Northwestern Nat. Cas. Co.,* 914 F.Supp. 459, 463 (D.Kan. 1996) ("Where there are primary and excess carriers and the primary fails to defend its insured in a liability suit and the excess insurer defends and pays a resulting judgment, the excess carrier is subrogated to the rights of the insured to seek reimbursement from the primary insurer").

Our decision in *American Nursing* guides our analysis of whether MO-PERM's equitable subrogation claim survives summary judgment under these facts. In *American Nursing,* an insurer's administrator brought action against an insured for equitable subrogation where the insured unjustly retained costs paid by the insurer that were owed to and meant for a health-care provider. Noting that the administrator's right to subrogation in this case is "not founded on contract, but is the creation of equity" the *American Nursing* court explained the doctrine of subrogation as such:

> Subrogation simply means the substitution of another person in the place of the creditor, so that the person in whose favor subrogation is exercised succeeds to the right of the creditor in relation to the debt. It is the mechanism whereby the equity of restitution of one person is worked out through the legal rights of another. The right of subrogation accrues to a person who has paid the debt or obligation for which another is primarily responsible. The person who claims subrogation, however, must have acted to make the payment under the compulsion of a legal liability or to protect some other interest. A person who intervenes to pay a debt for which another is primarily responsible, but officiously and without legitimate reason, acts as a volunteer and is not entitled to

be subrogated to the position of the creditor.

812 S.W.2d at 794 (citations omitted).

In *American Nursing,* because the insurer's administrator had paid the insured rather than the health-care provider, because the administrator had an obligation to pay the provider pursuant to the terms of its relationship with the insurer, and because the money was not owed to the insured, we held that subrogation was an appropriate remedy. The administrator did not pay the debt voluntarily. "To succeed to the shoes of the primary debtor, rather, it is enough that the person pay the debt in self-protection against a perceived loss should the debt not be discharged." *Id.* at 796 (citation omitted). "The avoidance of the cost of the defense [a suit between the insurer and the administrator] was alone sufficient reason for [the administrator] to intervene by payment directly to [the health-care provider], and so be subrogated to the rights of the [insurer] in that debt." *Id. See also Ins. Co. of N. Am. v. Travelers Ins. Co.,* 118 Ohio App.3d 302, 692 N.E.2d 1028, 1036 (1997) (excess insurer is not mere volunteer without right of recovery from primary insurer when it undertakes defense in face of primary insurer's refusal to defend); *Mississippi Farm Bureau Cas. Ins. Co. v. Amerisure Ins. Co.,* 2013 WL 286364, at *10 (S.D.Miss.2013) ("when the secondary or excess insurer, by the terms of its policy, is contractually obligated to defend the insured, it is not considered a voluntary payor when it takes on the role that the primary insurer wrongfully refuses"); 44 Am.Jur.2d *Insurance* § 1396 (2012) ("The insured should not be left without a prompt and proper defense, and if a primary liability insurer fails to assume the defense, for any reason, the excess insurer which has a duty to defend should provide the defense and, to do jus-

tice, should be entitled to recoup its costs from the primary insurer").

■ Similarly, under the particular facts of the case at bar, in avoiding the additional costs of litigation, which would have impacted both insurers, in settling the case before the additional damaging facts were disclosed, which would have substantially increased the value of plaintiff's claim, in maintaining its duty to settle in good faith, and in facing ACC's denial of primary coverage for Nurse and refusal to participate in good faith in the settlement, MOPERM advanced facts, which if proven, would have provided sufficient reason to intervene by payment to the plaintiffs and so to be subrogated to the rights of Nurse in the underlying action on that debt. In its holding, the *American Nursing* court noted that "equity of subrogation simply operates to ensure that the person who in fact owes the debt [the insured] must pay it." 812 S.W.2d at 795–96. Further explaining its rationale, the *American Nursing* court noted the equitable nature of subrogation: "Its aim is to do perfect justice and prevent injustice among all the parties, and to that end *does not stand on form to give its aid.*" *Id.* at 796 (internal citation omitted) (emphasis added).

Viewing the record in the light most favorable to MOPERM and noting that this claim lies in equity, ACC was not entitled to a judgment as a matter of law on MOPERM's claim of equitable subrogation. The record indicates facts, which if proven at trial would establish that ACC was the primary insurer for Nurse, that ACC denied that it was the primary insurer for Nurse, that ACC did not act in good faith on behalf of Nurse in crucial times regarding the proposed settlement, that a multitude of facts known to ACC pointed to Nurse's liability (falsification of records, failure to review crucial training records, failure to properly review medication rec-

ords, allowing an improper dose of a narcotic drug to be administered to a patient, etc.), that disclosure of some of Nurse's additional negligent actions was feared by the Joint Counsel to significantly increase the potential liability, damages and potential settlement value, that the Joint Counsel, who had investigated the matter, believed the Nurse's portion of responsibility was fifty percent, and that ACC utterly failed or refused to indemnify its insured. According to Joint Counsel, litigating the apportionment of fault between the various defendants during the settlement process almost certainly would have entailed disclosing facts that would have jeopardized the $350,000 settlement figure and potentially could have ruined settlement negotiations altogether. "That the primary debt of another may have been paid to the creditor indirectly *rather than directly, even prematurely,* therefore does not cut off the right of subrogation to the person under legal obligation to make the payment." *Am. Nursing,* 812 S.W.2d at 796 (emphasis added) (citation omitted). In substituting MOPERM, which provided settlement funds on behalf of a party for whom it was not the primary insurer, to the rights of Nurse, who has contractual indemnity rights with ACC, equitable subrogation thus constitutes an appropriate claim.

ACC argues that MOPERM cannot bring an action for equitable subrogation because MOPERM did not bring this action in the name of the real party in interest. Because MOPERM has established that summary judgment was entered in error as to its claim of unjust enrichment, *infra,* and because equitable subrogation is related to unjust enrichment, we decline to make that determination at this juncture but suggest the parties revisit the issue below. *See Kroeker v. State Farm Mut. Auto. Ins. Co.,* 466 S.W.2d 105, 110 (Mo.

App. W.D.1971);[8] *Keisker v. Farmer,* 90 S.W.3d 71 (Mo. banc 2002) (exploring subrogation and assignment).

ACC argues also that summary judgment is appropriate because the *Ethridge* court noted that equitable subrogation has been deemed "a fairly drastic remedy" allowed in "extreme cases bordering on if not reaching the level of fraud." 226 S.W.3d at 134. We note first that if MOPERM can establish, as it has alleged, that ACC breached its duties in bad faith, during the critical time in the settlement negotiations for purely self-interested reasons, these facts may be found to meet that standard. In any event, however, ACC is correct that *at least in cases involving liens against property,* equitable subrogation is allowed only in "extreme cases" that border on if not reaching a level of fraud. This is because of section 442.390, which provides that all purchasers of real property are deemed to purchase with notice of the contents public records thereof and all subsequent purchasers and mortgagors are deemed to purchase with notice "in law and equity." *Ethridge,* 226 S.W.3d at 134 (quoting lien cases); *Landmark Bank v. Ciaravino,* 752 S.W.2d 923, 928 (Mo.App. E.D.1988) (in exploring lien cases where equitable subrogation was claimed, court held: "For courts to allow equitable subrogation where no extreme circumstances are present would be nothing less than a judicial repeal of section 442.390 and would place the lending of money secured by real estate at great risk

and insecurity.") Those cases are far from the facts of this case and the policy reasons for their holdings are inapplicable herein. As noted above, the application of equitable subrogation hinges entirely on the facts of the individual case.

ACC argues too that summary judgment was appropriate because MOPERM cannot establish its damages or the amount of Nurse's liability in conjunction with the liability of the other defendants. However, the amount of damages and percentage of fault are issues for a trier of fact. *Wagner v. Bondex Int'l, Inc.,* 368 S.W.3d 340, 362–63 (Mo.App. W.D.2012).

The trial court erred in granting ACC's motion for summary judgment as to its claim for equitable subrogation. Due to unresolved factual questions, entry of summary judgment in favor of MOPERM would similarly be inappropriate.

### Unjust enrichment

MOPERM claims that it has stated a cause of action against ACC for unjust enrichment. "A right to restitution is established under unjust enrichment if the following elements are satisfied: (1) that the defendant was enriched by the receipt of a benefit; (2) that the enrichment was at the expense of the plaintiff; (3) that it would be unjust to allow the defendant to retain the benefit." *Homecomings Fin. Network, Inc. v. Brown,* 343 S.W.3d 681, 685 (Mo.App. W.D.2011) (internal citation and footnote omitted).

8. An issue was raised at oral argument as to whether MOPERM can act as the real party in interest. The crux of a subrogation claim is substitution. "Subrogation is defined as the substitution of one person in the place of another with reference to a lawful claim or right." *Estate of Griffitts,* 938 S.W.2d 621, 624 (Mo.App. S.D.1997) (quoting *Am. Nursing,* 812 S.W.2d at 794). "It is the 'substitution of another person in the place of the creditor, so that the person in whose favor

subrogation is exercised succeeds to the right of the creditor in relation to the debt.'" *Id.* (citation omitted). "At common law, in an action to enforce subrogation, the subrogee is neither a proper, nor a necessary party plaintiff, but he must sue in the name of the subrogor." *Kroeker,* 466 S.W.2d at 111. In part that is due to Missouri's requirement that a suit be brought in the name of the real party in interest, section 507.010. *Id.*

As to the first element, MOPERM argues that ACC was enriched by having its liability satisfied by a settlement in which it refused to participate. As to the second element, MOPERM argues that the settlement amount was funded exclusively by MOPERM, even as ACC acknowledges that it was responsible for a portion of that liability. As to the third element, MOPERM argues it would be unjust to allow ACC to retain a benefit. At oral argument, ACC conceded that MOPERM has met all three prongs.

■ In its brief, ACC disputed only the third element, that it would be unjust to allow ACC to retain a benefit. For the following reasons, we agree with ACC's concession at oral argument that this prong was met. Mere receipt of benefits is not necessarily a basis for restitution if the court does not find ACC unjustly enriched. *Farmers New World Life Ins. Co., Inc. v. Jolley*, 747 S.W.2d 704, 706 (Mo. App. W.D.1988) (citation omitted). *See also Howard v. Turnbull*, 316 S.W.3d 431, 436 (Mo.App. W.D.2010) ("Even if a benefit is 'conferred' and 'appreciated,' if no injustice results from the defendant's retention of the benefit, then no cause of action for unjust enrichment will lie.") In determining whether it would be unjust to permit the enriched party to retain benefits, "the court uses equitable principles in considering the various factors surrounding the relationship such as change of position, hardship, unreasonable delay, unclean hands, bad faith and other equitable principles of defense." *Farmers*, 747 S.W.2d at 705.

ACC argued in its brief that it was, at most, a "passive beneficiary" to MOPERM's acts, citing *S & J, Inc. v. McLoud & Co., L.L.C.*, 108 S.W.3d 765, 768 (Mo. App. S.D.2003). But that case is inapposite. In *S & J*, a successor landlord was held not to be unjustly enriched where a lease entered into by prior landlord misstated the square footage of the leased premises. The successor landlord was held to be a passive beneficiary of a mistaken calculation, and tenant was unable to show that rent was unreasonable for the premises leased. In short, the landlord was a "passive" beneficiary because it was not a party to the lease and had no knowledge of the previous landlord's wrongful conduct in miscalculating the leased space. *Id.* at 768.

■ Viewing the record in the light most favorable to MOPERM, we determine that MOPERM has alleged and presented evidence sufficient to survive summary judgment on this claim. The record indicates that ACC and MOPERM had an agreement to pay Joint Counsel to present a *joint* defense for *both* insurers to the action. Though ACC helped fund the defense, it refused to make key decisions in regard to the defense (the proposed settlement of the claim)—and thereby abandoned the agreement to present a joint defense. Further, ACC contested at the time of the settlement that it was the primary insurer to Nurse, even though MOPERM presented evidence that ACC's coverage counsel had previously advised ACC that it did in fact have the primary coverage for Nurse. There is also evidence that ACC failed to act on behalf of Nurse during critical times regarding the settlement negotiations, that a multitude of facts point to Nurse's significant liability, that disclosure of some of Nurse's additional negligent actions was feared by the Joint Counsel to double the potential value of Plaintiff's claim, and that the Joint Counsel, who had investigated the matter, believed the Nurse's portion of responsibility was fifty percent. Even so, ACC contributed nothing to the settlement of the claims against Nurse and placed MOPERM in the untenable position of paying

the entire settlement or subjecting itself and its insured to substantially higher potential damages.

In contrast to the defendant in *S & J,* ACC was not a passive beneficiary. ACC agreed to present a joint defense but then failed to follow through on that agreement. Allowing MOPERM to fund the settlement not only had the monetary effect of limiting global damages to the amount of the settlement, but it also stopped defense risks, including the risk of a larger judgment against Nurse and the risk of additional litigation against Nurse, e.g., failure to defend, indemnify, and settle in good faith, and ceased the costs of the defense of Nurse, including the attorney fees that were being incurred.

As noted above, ACC conceded at oral argument that MOPERM had presented sufficient evidence of all three prongs of a claim for unjust enrichment so as to survive summary judgment. ACC argues, however, that after discovery had closed, MOPERM had not endorsed appropriate experts to prove the issue of damages and that therefore the claim must fail.

■ It is well established, however, that pursuant to Rule 74.04, a summary judgment motion can rely only on facts based in the record. In any event, it would be premature at this juncture to determine the issue of damages, particularly given that the underlying remedy is equitable. "[A] party is awarded only the amount of the enrichment that would be unjust for the other party to retain, rather than the actual amount of the enrichment." *Homecomings,* 343 S.W.3d at 685 (citation omitted). "In deciding whether to reimburse a party, the court must balance the equities between the parties." *Id.*

We thus conclude MOPERM presented sufficient evidence of unjust enrichment so as to withstand ACC's motion for summary judgment. The particular amount of the enrichment, if it is indeed established, is a question for a trier of fact. Nonetheless, as there were clearly disputed factual issues, the trial court thus erred in granting ACC's motion for summary judgment on this claim. Due to those same factual questions, entry of summary judgment in favor of MOPERM would similarly be inappropriate.

### Equitable contribution

To establish equitable contribution, MOPERM must prove: (1) MOPERM jointly incurred obligations with ACC, (2) MOPERM paid those obligations, (3) MOPERM demanded contribution from ACC, and (4) ACC refused to contribute. *Centerre Bank of Kansas City, Nat. Ass'n v. Angle,* 976 S.W.2d 608, 621 (Mo.App. W.D. 1998).

Elaborating on those elements, the Eastern District of our Court has observed the following:

Equitable contribution is the right to recover from a co-obligor who shares liability with the party seeking contribution. The right to contribution arises when several insurers are obligated to indemnify the same loss, and one insurer has paid more than its share of the loss. Where multiple insurance carriers insure the same insured and cover the same risk, each insurer has independent standing to assert a cause of action against its coinsurers for equitable contribution when it has undertaken the indemnification of the common insured. The right of contribution permits reimbursement to the insurer that paid on the loss for the excess it paid over its proportionate share of the obligation. In order to have a right of contribution on the ground of concurrent insurance, the insurance provided by each must

cover the same insured, the same interest, and the same risk. *Heartland Payment Sys., L.L.C. v. Utica Mut. Ins. Co.,* 185 S.W.3d 225, 232 (Mo. App. E.D.2006).

■ ACC does not appear to contest that MOPERM established the elements of equitable contribution. Rather, ACC argues that MOPERM cannot recover because the two insurers did not cover the same risk or loss. "The right to contribution arises when more than one insurer is liable for the same loss and when one insurer has paid more than its share of the loss." *Wentzville Park Assoc. L.P. v. Am. Cas. Ins. Co.,* 263 S.W.3d 736, 740 (Mo. App. E.D.2008).

■ The question, then, is whether the two insurers were liable for the same loss assuming that MOPERM paid more than its share of the loss. Often courts look to the insurance policies and base the analysis on the "other insurance" clauses contained therein, which are provisions "inserted in insurance policies to vary or limit the insurer's liability when additional, concurrent insurance exists to cover the same loss." *Farm Bureau Town & Country Ins. Co. of Mo. v. Am. Alt. Ins. Corp.,* 347 S.W.3d 525, 532 (Mo.App. W.D.2011). Examples of "other" clauses include (1) a "pro rata" clause, which provides that the insurer will pay its pro rata share of the loss, usually in the proportion that the limit of its policy bears to the total of the limits of all valid and collectible insurance; (2) an "excess" clause, providing that an insurer's liability shall be only the amount by which the loss exceeds the coverage of all other valid and collectible insurance, up to the limit of the policy; (3) an "escape" or "no liability" clause, providing that the insurer is not liable for a loss that is covered by other valid and collectible insurance. *Wentzville,* 263 S.W.3d at 740. In cases without "other insurance" clauses the loss-

es may be prorated between the insurers. *Heartland,* 185 S.W.3d at 231.

In this case, such "other insurance" analysis is unnecessary because the parties now agree that ACC was the primary insurer for Nurse and that MOPERM was the primary insurer for all other defendants and that the global settlement did not exceed the coverage limits of the primary insurance coverage for each defendant. Neither party requests our review of the terms of either insurance contract under this Point Relied On. In essence, then, both insurers now agree that they were primary insurers for separate defendants in this global settlement and those defendants were jointly and severally liable for the total damages paid.

Put another way, ACC argues that MOPERM cannot survive summary judgment on the claim of equitable contribution because the two insurance companies did not insure the same risk in that, as to Nurse, ACC held the primary coverage and MOPERM held excess coverage. ACC argues therefore that the primary coverage and excess coverage are not the same risk and the claim must fail, citing *Exec. Risk Indem., Inc. v. Charleston Area Med. Ctr., Inc.,* 681 F.Supp.2d 694, 709 (S.D.W.Va. 2009). While *Executive Risk* and many other cases hold that there is no cause of action for equitable contribution as between primary and excess insurance carriers because the insured risk is not the same risk, for the reasons stated above, we disagree that those cases are applicable to the facts before us. In this case, MOPERM is not asking for contribution as the carrier of excess coverage on Nurse. MOPERM's action is based on its primary coverage for the other six defendants in the underlying cause of action who were jointly and severally liable with Nurse for plaintiff's damages.

While this appears to be a case of first impression, we see no policy reason that the theory of equitable contribution should not be applicable to the facts of this case. Based on the facts presented to the trial court in the summary judgment motions, MOPERM had a duty to the six defendants for whom it had primary coverage and a duty to Nurse for whom it had excess coverage. It was aware that all defendants were jointly and severally liable for all damages. It was faced with a global settlement offer to settle all claims against all defendants for an amount that was within the provided primary coverage. The settlement was of limited duration and there was substantial evidence that if the settlement was not accepted or if the defendants litigated their respective percentage of liability for the settlement, that the total damages as to all defendants would be significantly increased. ACC refused to participate in the settlement process arguing that it had no coverage, even though it was aware that this argument was without merit. MOPERM was faced with the dilemma of either violating its duty to its insureds and fighting the apportionment of damages between itself and ACC and thereby causing the proposed settlement to be potentially withdrawn or in the alternative paying the settlement and seeking contribution from ACC in a separate action. If the above facts are proven at trial, MOPERM is entitled to some portion of the damages it paid to settle these claims to be recovered from ACC.

Issues surrounding damages, including apportionment thereof, are questions for a trier of fact in a proceeding below. This is particularly true given that the defendants were sued in joint and several liability and the global settlement addressed all claims against all defendants in one lump sum. *See Wood v. Wood,* 2 S.W.3d 134, 139 (Mo.App. S.D.1999) (generally, "persons who sign as makers as part of the same transaction are jointly and severally liable unless the instrument specifies otherwise, and a maker who pays the instrument is entitled to contribution from other co-makers"); *Transwestern Indust., Inc. v. Shue,* 537 S.W.2d 848, 849 (Mo.App.1976) ("legal rule is that absent proof to the contrary, it is presumed that co-obligors received equal benefit from the obligation and must contribute equally to its payment").

The trial court erred in granting summary judgment in favor of ACC on the claim of equitable contribution. Due to similar factual issues, summary judgment in favor of MOPERM was also not appropriate.

## CONCLUSION

For the foregoing reasons, the trial court did not err in denying MOPERM's motion for summary judgment but did err in granting summary judgment in favor of ACC. As we note throughout, factual issues as to liability and damages are issues for a trier of fact.

This case is reversed and remanded for further proceedings consistent with this opinion.

All concur.